**STATE FARM FIRE & CASUALTY COMPANY, Appellant,**

**v.**

**James L. SIMMONS and Cynthia Simmons, Appellees.**

**No. 09–91–258 CV.**

Court of Appeals of Texas, Beaumont.

June 24, 1993.

As Corrected July 1, 1993.

Rehearing Denied July 8, 1993.

Katherine Hunt, Kathleen Crouch, William J. Boyce, Joy Soloway, Fulbright & Jaworski, Houston, for appellant.

James C. Plummer, Plummer & Associates, Houston, for appellees.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

WALKER, Chief Justice.

This appeal comes to us following a lengthy jury trial and judgment entered upon a unanimous jury verdict in appellees' favor. It originates from the 221st Judicial District Court of Montgomery County, Texas, the Honorable Lee Alworth, Judge Presiding. Appellees, James L. Simmons and wife, Cynthia Simmons, were Plaintiffs be-

low, and appellant, State Farm Fire & Casualty Co. was defendant below.

The original lawsuit was brought by appellees against appellant seeking to enforce their homeowners policy following a fire loss. Appellees sought not only contractual damage recovery, but also sued appellant for violation of State Farm's common-law duty of good faith and fair dealing, violation of the Deceptive Trade Practices Act and violations of the Texas Insurance Code. Appellees also sought to recover damages, both actual and punitive, along with attorney's fees and costs.

Appellant, State Farm, denied appellees' claim for fire loss which resulted in the total destruction of appellees' home. Appellant contends that appellees were responsible for the fire.

Following approximately nine days of testimony, the jury returned a unanimous verdict in favor of appellees, awarding both actual and punitive damages. The trial court entered judgment based upon the jury's verdict. Appellant filed post-trial motions for new trial or remittitur, judgment notwithstanding the verdict, and to modify, correct or reform the judgment. All of appellant's motions were either denied by the trial court or by operation of law. The trial court entered judgment upon the jury's verdict from which appellant has perfected its appeal setting forth twelve points of error.

Factually, on June 2, 1985, at approximately two o'clock in the morning, appellees left their home in Montgomery County, Texas, for the purpose of traveling to Louisiana to take their children to stay with relatives for the entire summer. A short time after appellees had left on their journey, Irene Lawrence, whose newspaper delivery route takes her by appellees' home, spotted smoke. Lawrence borrowed a neighbor's phone and quickly alerted the fire department. Within minutes, the volunteer fire department arrived on the scene and began attacking the fire. Unfortunately, by the time the firemen arrived, much of the roof was already engulfed in flames and the firefighters were unable to save the house.

James and Cynthia Simmons returned to their home in the early evening of Sunday, June 2, 1985. Returning with them was Mr. Simmons' mother, who had traveled with them on this brief, one day trip, and a nephew who they were bringing back from Louisiana. When the Simmons arrived at their home, they discovered that sometime after they had left in the early morning hours, their home and all of their possessions had been destroyed by fire. Later that night while trying to obtain basic toiletries such as toothbrushes and the like, Ms. Simmons saw her husband crying for the first time since her mother's funeral years before. The next time Ms. Simmons saw her husband break down and cry was the day, some months later, when they were told that their insurance carrier, appellant, State Farm, was denying their claim for fire loss. Appellant says that neither of the appellees shed tears or appeared agitated.

The following day, which was Monday, the Simmons reported the fire to State Farm. The record reflects that the Simmons fully cooperated with State Farm in its investigation, which included the authorization of State Farm to obtain all of the financial information it might desire. Appellees contend that unknown to them, State Farm from the inception decided to investigate appellees and set out within a few days of the investigation to "tie down" the arson triangle from which it could conclude that the Simmons were responsible for the fire. At the conclusion of State Farm's investigation, it concluded that the Simmons were responsible for the fire, although it had no direct evidence of the Simmons' involvement. Appellant, State Farm, concluded that the fire was incendiary, that the Simmons had the opportunity to set the fire and that the Simmons' had the motive to set the fire. Evidence revealed that appellant's "strongest aspect" of motive was to enable the Simmons to get out from under a high monthly mortgage obligation.

The Simmons initially gave State Farm information regarding the status of the mortgage, which was substantially correct.

State Farm sought and received information from the Veterans' Administration which State Farm chose to rely upon rather than the information furnished by the Simmons. State Farm concluded from the information received from the Veterans' Administration that the Simmons had not made a mortgage payment since January, an entire six month period before the fire, and that the Simmons had a monthly mortgage obligation at the time of the fire of $1,343 per month. From this, State Farm concluded that the Simmons' monthly expenses significantly exceeded their income. Evidence at trial showed that the information State Farm received from the Veterans' Administration regarding the mortgage was incorrect. Appellees contend that State Farm not only knew this information was incorrect, but that State Farm had discovered its error. Instead of $185 per week plus the regular monthly mortgage obligation of $603 which would total $1,343 monthly, Mr. Simmons had rescheduled payments with the Veterans' Administration for considerably less. Based upon Mr. Simmons' agreement with the V.A. the Simmons' mortgage obligation was $185 per week. Appellees point out that State Farm's erroneous conclusion resulted in a showing of 180% increase over the Simmons' actual mortgage obligation.

When State Farm began its investigation the first entry made in its activity log on the day following the fire certainly could have been viewed by the jury as placing some suspicion upon the Simmons for setting the fire. The entry reads: "Talked with Agent. He feels claims could be suspicious. Just had large theft loss."

The basis for this suspicion was due to a recent burglary of the Simmons' home wherein a number of items were stolen. State Farm promptly paid the loss. State Farm considered it suspicious because the policy was then relatively new and because of the unusual description given by Mr. Simmons on how the burglary had occurred. The Simmons' file was then referred to State Farm's Special Investigative Unit, the "SIU." The investigation was then handled by SIU Agents, Michael Hvasta and Superintendent Joe Tabor.

This SIU unit operated as a special arson and fraud unit, which was created in 1985 for the purpose of investigating large fire losses or losses in which the insured was suspect. Hvasta interviewed and took a recorded statement of Mr. and Ms. Simmons. Mr. Simmons, in the recorded statement, reluctantly identified the suspect burglars, several neighborhood boys, as possible enemies who might want to harm them. Hvasta then noted these young men, Tim Mattix, Charles Wooddell, and James Wooddell, as "enemies" and possible "suspects" in the fire. Mr. Simmons also informed Hvasta he was behind in his mortgage and had worked out a repayment agreement with the Veterans' Administration, which involved weekly payments in lieu of monthly obligation. Mr. Simmons further informed Hvasta that he, Simmons, was not presently current on those payments.

State Farm did not discover until sometime after July 17, more than a month after the fire, that the burglary had in fact occurred and that Mattix and one of the Wooddell boys had confessed. These confessions were obtained by police officials in April and May of 1985, shortly before the Simmons' fire. Hvasta did determine that there had been a confrontation between Mr. Simmons and one of the suspects, Tim Mattix, following the burglary. Hvasta had been told that this suspect had tapped into the Simmons' phone line and Hvasta verified this information. These suspects were never contacted or interviewed regarding their whereabouts at the time of the fire. Hvasta did not investigate the police or criminal files on these suspects. The reasons given by State Farm for not following through with an investigation of the "suspects" varied. Hvasta first said he could not find them. He then acknowledged an earlier statement that they were not interviewed because he felt they would not tell him anything. Contacting or interviewing the suspects was not, according to Hvasta, important. One suspect was "reportedly" or "supposedly" in Dallas. No effort was made to interview the one "suspect" who was in jail at the time of the fire

because Hvasta also felt he would not tell him anything. It was not until some five years later, just before trial, that State Farm discovered the primary suspect with whom Mr. Simmons had had confrontation, Tim Mattix, was released from jail just two weeks before the fire. The whereabouts of Mattix and one of the Wooddell boys, at the time of the fire, was never precisely determined.

The Montgomery County Fire Marshal was called to testify and did testify that spite and revenge was the number one motive for fires in Montgomery County in 1985. Hvasta himself also testified to the characteristics of the spite and revenge arsonist and juvenile arsonist. Significantly, these were characterized by youth, threats or altercations. Hvasta acknowledged that there were a lot of fires set by juveniles. Knowing of the confrontation Mr. Simmons had with one of the suspects, and that the Simmons' home had been burglarized, Hvasta made no contact whatsoever with these youths. We think it proper to conclude from the evidence that Hvasta did not pursue an investigation of these neighborhood boys which SIU had listed as suspects. The SIU investigation was deficient in other respects. Neither Hvasta nor others retained by State Farm located or interviewed the person who reported the fire or the first fireman on the scene. Hvasta acknowledged the Montgomery County Fire Marshal and others as important people to interview because information solicited from them might relate to the discovery of evidence relating to the fire. The first fireman on the scene and the suspect, Mattix, in fact lived across the street from each other, just down the road from the Simmons'. Two other persons listed by Hvasta as potential enemies of the Simmons', Enrique Viabolo and Alfredo Alverez, were never interviewed.

Mike Hvasta admitted that as early as June 11, when he contacted the V.A., it was his intent to "tie down" the arson triangle, and establish a financial gain motive for the Simmons to set the fire. Hvasta acknowledged that at the time the Claim Committee Report was prepared they were not looking at anybody else for having a motive to set the fire, but their insured, the Simmons. This singular focus was acknowledged by the SIU Superintendent, Joe Tabor.

State Farm predicated its case for arson and the basis for its denial of the Simmons' claim on what State Farm purported to be circumstantial evidence of arson by the Simmons. This circumstantial evidence case was based on the concept of an arson triangle, motive, opportunity and incendiary origin. State Farm concluded that the "strongest aspect" of motive was to get out from under the burden of the Veterans' Administration mortgage. As previously stated, Hvasta had incorrectly reported information regarding the status of the Simmons' mortgage obligation. Hvasta had information furnished by the Simmons and incorrect information furnished by the Veterans' Administration. Instead of reflecting all of this information in his report, Hvasta chose to rely on the higher erroneous figure supplied by the V.A. Appellees contend that this reflects a conscious decision to completely ignore, in its analysis, the information supplied by its insured, information that would directly address the issue of motive. Appellees contend that this evidence is one of several examples of lack of objectivity by State Farm.

The jury heard evidence that State Farm knew that even if the policy proceeds had been paid and applied to the mortgage, there would still have been a remaining mortgage balance.

After an approximate four month investigation, appellant, State Farm, concluded that the Simmons set their house on fire, and thus denied appellees' claim under their homeowners policy. Appellant's point of error one contends (1) that there was neither factually nor legally sufficient evidence to support the jury's finding that (a) there was no reasonable basis for State Farm's decision to deny the Simmons' claim and (b) that State Farm should have known there was no reasonable basis for the denial and (2) that it was error for the trial court (a) to overrule State Farm's Motions for Directed Verdict to Disregard Findings of the Jury and for judgment notwithstand-

ing the verdict; (b) to award the Simmons' $200,000 in actual damages to overrule State Farm's Motion for New Trial or Remittitur, and to allow State Farm's Motion to Modify, Correct or Reform the Judgment to be overruled by operation of law. Appellant's point of error two attacks the factual and legal sufficiency of the evidence as to the jury's finding that State Farm's failure to act fairly and in good faith in the handling of the Simmons' insurance claim was a proximate cause of damages to the Simmons. We shall address points of error one and two together.

■ It is compelling that we address appellant's "no evidence" points first. In considering and determining legal sufficiency or no evidence points of error, we must only consider the evidence and the inferences therefrom, which tend to support the jury's findings. Furthermore, we must consider that evidence and the inferences therefrom, if any, in a manner most favorably in support of the jury's findings, and disregarding all evidence and inferences to the contrary. *See, Havner v. E-Z Mart Stores, Inc.,* 825 S.W.2d 456, 458 (Tex.1992); *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987). We shall sustain a no evidence point of error only when the record discloses a complete absence of evidence of a vital fact, or if the evidence offered to prove a vital fact amounts to no more than a scintilla, or if the evidence conclusively establishes the opposite of a vital fact. *See, C & C Partners v. Sun Exploration & Prod. Co.,* 783 S.W.2d 707, 716 (Tex.App.—Dallas 1989, writ denied). It is not within the province of reviewing courts to second guess factfinders unless only one inference could be drawn from the evidence. *Havner,* 825 S.W.2d at 456. If there is any evidence of probative force to support the verdict, reviewing courts must affirm. *Lundy v. AllState Ins. Co.,* 774 S.W.2d 352, 358 (Tex.App.—Beaumont 1989, no writ).

■ In determining "factual insufficiency" points of error, appellate courts must consider and weigh all of the evidence, including any evidence contrary to the trial court's judgment. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). We cannot set aside a jury finding unless it is so contrary to the overwhelming weight of evidence as to be clearly wrong and manifestly unjust. *Lundy,* 774 S.W.2d at 358. We cannot substitute our judgment for that of the jury even if a different answer could be reached on the evidence. *Herbert v. Herbert,* 754 S.W.2d 141, 144 (Tex.1988); *Commonwealth Lloyd's Ins. Co. v. Thomas,* 825 S.W.2d 135, 143 (Tex. App.—Dallas 1992) judgment set aside on other grounds, 843 S.W.2d 486 (Tex.1993). It is also not the function of a reviewing court to reweigh the evidence or re-evaluate the credibility of the witness. *Lundy,* 774 S.W.2d at 359.

We now apply these standards to the case at hand. We believe it elementary that when calamity occurs, insureds look to their insurers for assistance. In our case the Simmons, insured homeowners, looked to State Farm to fulfill its obligation under the insurance contract. The very purpose of indemnity insurance is to indemnify the insured for the covered loss. Underlying, intertwined, and legally required, is the duty of the insurer to handle an insured's claim pursuant to the duty of good faith and fair dealing. *See, Transamerica Title Ins. Co. v. San Benito Bank and Trust Co.,* 756 S.W.2d 772, 775 (Tex.App.—Corpus Christi 1988), *judgment set aside on other grounds,* 773 S.W.2d 13 (Tex.1989). This duty of good faith and fair dealing arises from that special trust relationship between an insurer and its insured. The duty of good faith and fair dealing by an insurer toward its insured is the stop-gap which fills the void resulting from a disparity of bargaining power and exclusive control that the insurer has and exercises over claim processing. *See, Aranda v. Insurance Co. of North America,* 748 S.W.2d 210 (Tex.1988). State Farm admits and recognizes this special relationship and its duty of loyalty to its policyholders. Once an insurer takes action on a claim, it has a duty to protect the interest of its insured. *See, Transamerica Title,* 756 S.W.2d at 775. State Farm had a duty to process the Simmons' claim which includes an obligation to seek the establishment of cover-

age for the Simmons and to eliminate exclusions from coverage if possible. The Simmons paid State Farm for protection against the very kind of catastrophic loss suffered by them. State Farm had the obligation to assist the Simmons when the fire loss occurred, help resolve coverage questions, and pay the claim. Certainly these duties and obligations on State Farm become inapplicable where it is shown that the insured intentionally brought about their own catastrophic result and loss.

■ For an insurer to escape this duty of good faith and fair dealing it must have a reasonable basis for denying a claim made by its insured. To establish the absence of such reasonable basis for denial, a claimant must show that its insurer knew or should have known there was no reasonable basis for its denial. *See, Vail v. Texas Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129 (Tex.1988); *Aranda*, 748 S.W.2d at 213; *Arnold v. Nat'l County Mut. Fire Ins. Co.*, 725 S.W.2d 165 (Tex.1987). An insurer is held to that degree of care and diligence which a man of ordinary prudence would exercise in the management of his own business. *Id.* at 167.

Obviously, much of the evidence presented to the jury below focused upon the issue of whether or not State Farm had a reasonable basis for denying the Simmons' claim. In arriving at its decision, the jury had before it the entirety of State Farm's claim file, which included its Claim Committee Report in which State Farm purported to document all the information upon which it based its decision to deny the claim. The jury also had before it a considerable amount of other evidence, both documentary and live testimony. State Farm admitted at trial its obligation to conduct a fair, objective, thorough and systematic investigation. State Farm acknowledged that its obligation was to turn every leaf in its investigation, consider the positive along with the negative, and indulge its policyholder with the benefit of the doubt. The record is replete with evidence from State Farm as to its perceived duty toward its insureds.

■ From a review of all the evidence the jury could and obviously did conclude that State Farm's investigation began and ended with the Simmons. Appellees argue that the evidence resulting from State Farm's investigation was "outcome oriented" from the inception. When the jury heard evidence of what State Farm did not do regarding its obligation to fairly, objectively, thoroughly and systematically investigate the Simmons' claim, it is certainly conceivable that the jury could conclude that State Farm began with its intended outcome and investigated backwards toward the Simmons.

The standard by which a cause of action rests for breach of the duty of good faith and fair dealing is set forth in *Aranda*, 748 S.W.2d at 213. It is incumbent upon the insureds to show "the absence of a reasonable basis for denying or delaying payment of the benefits of the policy." In *Aranda*, our Supreme Court stated the "standard of care" for this element as follows: "The first element of this test requires an objective determination of whether a reasonable insurer under similar circumstances would have delayed or denied the claimant's benefits." *Id.* The insured must prove the insurer knew or should have known that there was not a reasonable basis for denying the claim or delaying payment. *Id.* A duty is imposed upon an insurer to that degree of care and diligence, which a man of ordinary care and prudence would exercise in the management of his own business. *Arnold*, 725 S.W.2d at 167.

Court of Appeals cases subsequent to *Aranda* and *Arnold*, have followed the stated standard in reviewing actions for the breach of the duty of good faith and fair dealing. We forego citation or analysis of those Court of Appeals decisions by simply referencing the more recent San Antonio Court of Appeals decision, *State Farm Lloyds, Inc. v. Polasek*, 847 S.W.2d 279 (Tex.App.—San Antonio 1992, writs requested). We believe *Polasek* sets forth an adequate historical review of the standard for good faith and fair dealing. The facts in *Polasek* are very similar to our facts. We do not, however, agree with the conclusion reached by the San Antonio Court of

Appeals. We perceive *Polasek* as an abrupt substantive departure from present law. That Court says at page 283:

The Polaseks' bad faith cause of action is not satisfied by proof that they did not commit arson. It is not satisfied by proof that State Farm should have paid their claim, or that State Farm acted unreasonably in denying their claim. Instead their bad faith cause of action required proof of a negative: that *no reasonable basis existed* for denying, or delaying payment of, their insurance claim. The plaintiff in a bad faith case must prove that the insurer had "no reasonable basis" for denying the claim or delaying payment, or that it failed to determine whether there was "any reasonable basis" for denying or delaying payment. *Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987). He must establish "the *absence of a reasonable basis* for denying or delaying payment of the benefits of the policy" and that the carrier knew or should have known that there was no reasonable basis for denying or delaying payment. *Aranda v. Insurance Co. of North America*, 748 S.W.2d 210, 213 (Tex.1988) (emphasis added). Under the bad faith cause of action, said the *Aranda* court, "carriers will maintain the right to deny invalid or questionable claims and *will not be subject to liability for an erroneous denial of a claim." Id.* (emphasis added) Thus the bad faith cause of action requires much more demanding proof than the suit on the insurance policy. [emphasis in original]

We view *Polasek* as a virtual abrogation of the common-law duty of good faith and fair dealing. We admit and recognize that our use of the word "abrogation" may be a bit strong. To abrogate, in law, means to "abolish by an authoritative act; repeal." WORDS BOOK DICTIONARY (1972). *Polasek* does not actually "abolish" or "repeal" the common-law cause of action for breach of the duty of good faith and fair dealing by insurers. Rather, *Polasek* just makes an insured's burden of proof virtually impossible.

Our threshold disagreement with *Polasek* lies with the following language at page 285:

In a bad-faith action, the issue is whether there was evidence in existence *before State Farm;* the issue is not whether State Farm correctly evaluated the evidence before it. Therefore under the no-evidence standard of review we do not disregard the evidence that was indisputably before State Farm when it denied the claim. Courts and juries do not weigh the conflicting evidence that was before the insurer; they decide *whether evidence existed* to justify denial of the claim. (emphasis ours)

We perceive the foregoing to be an extreme departure from *Aranda* and its progeny. We further believe that the *Polasek* holding eliminates the "should have known" requirement under *Aranda.*

Our reason for viewing *Polasek* as an abrogation of that common law cause of action is the San Antonio Court's position that, "[u]nder *Aranda* the issue is whether there was a reasonable basis, and this inquiry cannot be resolved by looking at the insured's evidence and deciding that the insurer should have believed it instead of other evidence." *Id.* at 286. Query: If the burden of proof be on the insured and we cannot look at the insured's evidence, then haven't we created an impossible burden for policyholders? If we are now compelled to review only, "evidence in existence before State Farm," haven't we granted additional license to insurers, whereby they cannot only sell the coverage, but also totally control the question of whether proceeds should be paid, by positioning that in their (insurers') minds the insured was responsible for the loss. The arson triangle consists of motive, opportunity and incendiary origin. It is difficult to conceive of a situation when a fire is determined to be of incendiary origin, that an insurer cannot thereafter simply presume motive and opportunity.

Insurers will no doubt argue that *Polasek* is a much needed change in an insured's burden of proof. We position that *Polasek* has effectively removed the ques-

tion of good faith and fair dealing from the factfinding process and has placed such question in a matter of law vacuum. In support of this position, we view the exact language of the *Polasek* Court at page 287:

We recognize that under *Aranda* and *Arnold* the basis for denying the claim must be reasonable. *But this does not authorize the trier of fact to second-guess the insurer about reasonableness. And it does not authorize the trier to decide whether the insurer acted reasonably.* It means that the basis for denying or delaying payment must have some substance to it; it cannot be fanciful or flimsy. Not just any asserted basis will suffice. A scintilla of evidence suggesting arson would not be enough. *But if the circumstantial evidence before the insurer reasonably suggests that the insured may have committed arson, there is no bad faith cause of action, even though the jury would easily have resolved the issue in the insured's favor.* (emphasis ours)

The evil, now protected under *Polasek*, is that an insurer may simply investigate a claim in an outcome oriented manner, focusing solely upon any evidence that shades the issue in the insurer's favor. If factfinders are no longer authorized to "decide whether the insurer acted reasonably," are not insurers now free to determine their own actions or inactions as a matter of law? This is not only dangerous precedent, it is frightening precedent.

We believe the case before us to be a classic example of the potential danger now protected by *Polasek*. In our case we have an insurer, State Farm, no doubt one of the larger insurance companies in America. We risk ridicule by suggesting that appellant insurance company could, if it so desired, amass an investigative force which could rival our Federal Bureau of Investigation. Our insured could not amass sufficient funds to effectually fulfill the original monthly obligation on their mortgage. State Farm had a special investigative unit which we have previously referred to as "SIU." From the inception of State Farm's investigation of the Simmons' claim, State Farm began and ended with the connection of the arson triangle, i.e., that the fire was incendiary in nature, that the Simmons had the opportunity to set the fire, and that the Simmons had the motive to set the fire. Thus concludes State Farm's investigation of the loss claimed by the Simmons. State Farm was given other evidence, leads and facts which would have urged a "man of ordinary prudence" to pursue further inquiry. Did State Farm use that degree of care and diligence which a man of ordinary prudence would exercise in the management of his own business? We think, upon a review of the entire factual record in this case, that the answer is clearly, "No." Under *Polasek*, State Farm did enough as a matter of law.

*Polasek* so deteriorates the degree of care and diligence required of an insurer toward its insured as to make that requirement nonexistent. Hypothetically, applying *Polasek* to our facts, had the neighborhood boys appeared at trial, confessed to arson, testified that they would have so informed State Farm if asked, the Simmons' burden would not be met. It is the mind-set of State Farm which controls the issue of reasonableness, not the truth which may result from thorough investigation. *Polasek* effectively destroys that special relationship of loyalty owed by an insurer to its policy holders. It also destroys the requirement that once an insurer takes action on a claim, it has a duty to protect the interest of the insured. *Transamerica Title*, 756 S.W.2d at 775.

The *Polasek* Court gives a detailed rendition of "no evidence" and "insufficient evidence" as same applies to the question of bad faith. We run contrary to our San Antonio Court on its conclusion at page 284 that "where there is *undisputed* evidence that a reasonable basis existed for denying an insurance claim, the bad faith cause of action is defeated as a matter of law." (emphasis theirs) The *Polasek* Court holds that, "In deciding whether a reasonable basis existed for denying an insurance claim, the trier does not weigh conflicting evidence; it decides whether the evidence existed and whether, standing alone, it constituted a reasonable ground for denying

the claim." *Id.* This is contrary to the expressed instructions of the trial court to the jury in the instant case:

> This case is submitted to you on questions about the facts, which you must decide from the evidence you have heard in this trial. You are the sole judges of the credibility of the witnesses and the weight to be given their testimony, but in matters of law, you must be governed by the instructions in this charge.

*See also,* TEX.R.CIV.P. 226a. *Polasek* concludes that if a reasonable basis exists for questioning the insurance claim, the insurer may deny it and litigate the matter without also facing a bad faith claim. We basically agree with this statement. We disagree with the ultimate application of this statement to the conclusion reached by the *Polasek* Court. Where we run afoul of our San Antonio colleagues is in the statement that, "In a bad-faith action, the issue is whether there was evidence in existence before *State Farm;* the issue is not whether State Farm correctly evaluated the evidence before it." (emphasis ours)

We previously stated that the duty of good faith and fair dealing by an insurer is the stop-gap which bridges the disparity of bargaining power and exclusive control which an insurer has and exercises over claim processing. If *Polasek* is correct, there is no stop-gap, but rather an open abyss from which policyholders, as a matter of law, have no escape. The entire matter regarding claims investigation now begins and ends with the insurer. Applying this principle, which effectively abrogates an insurer's duty to thoroughly, fairly, objectively investigate, policyholders cannot now offer meaningful evidence which would show that the insurer limited its investigation to the outcome it desired. It is only the evidence that is acknowledged by State Farm that is important and conclusive.

We believe the far better rule in bad faith actions to be, "Did the insurer fulfill its duty to its insured by pursuing a thorough, systematic, objective, fair, and honest investigation of the claim prior to denying such claim?"

In the case before us State Farm presented nothing more than suspicions that the Simmons may have been responsible for their own fire loss. State Farm did not make a thorough investigation regarding the circumstances involving the young men who burglarized the Simmons' home. State Farm did not fairly and objectively seek interview with the person who reported the fire nor the first fireman on the scene at the fire. Obviously, all of the investigative information possessed by State Farm focused exclusively on the Simmons for, quite obviously, State Farm sought no other cause. Now, bearing in mind the *Polasek* holding, the issue becomes, "whether there was evidence in existence before State Farm . . ." Yes, as a matter of law, there was evidence before State Farm which constituted to State Farm a reasonable basis for denying the Simmons' claim. We fear that the *Polasek* rule will abolish an insurer's good faith duty of fair dealing with its policyholders.

Appellees boldly assert that *Polasek* is "bad law." In *Arnold,* our Supreme Court spoke of a "special relationship" arising out of the "parties' unequal bargaining power and the nature of insurance contracts," of insurers denying coverage "with no more penalty than interest on the amount owed," of insurance companies having "exclusive control over the evaluation, processing, and denial of claims." *Arnold,* 725 S.W.2d at 167. State Farm acknowledged that special relationship, unequal bargaining power, and control over the handling of the Simmons' claim.

Whether *Polasek* is good or bad law depends upon the perspective from which it is viewed. Clearly *Polasek* is good law for insurance companies, and clearly *Polasek* is bad law for policyholders. The *Polasek* Court, in footnote at page 282, discusses that arson has become a national problem, according to Justice Department reports. We offer no rebuttal or argument to the contrary. Our question is simply this, should our national arson problem provide a matter of law escape for insurance companies as to their duties to their policyholders? Our research informs that a writs

have been sought by both parties in *Polasek*. It would simply be nice that the issue of good faith and fair dealing be ultimately determined by objective review of that "special relationship" existing between insurers and insureds, personal philosophies and politics aside. Points of error one and two are overruled.

■ Appellant's points of error three, four and five essentially contend that the jury's finding that the Simmons did not commit arson was erroneous as a matter of law or such finding was against the great weight and preponderance of the evidence. Appellant also contends that the jury's erroneous finding on the predicate issue vitiates the trial court's award of $75,000 in actual damages. Appellant challenges this actual damage award on factual insufficiency grounds.

We must uphold the jury's verdict unless we find that the evidence was so weak or that the finding was so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. This same standard of review applies whether for a negative or affirmative jury finding. *See Herbert*, 754 S.W.2d at 143. State Farm had the burden of proof on the issue of arson. It was incumbent upon State Farm to prove by a preponderance of the evidence that the Simmons committed arson. *See, Bufkin v. Texas Farm Bureau Mut. Ins. Co.*, 658 S.W.2d 317, 322 (Tex.App.—Tyler 1983, no writ). The jury's failure to find that the Simmons committed arson effectively means that State Farm failed to meet its burden. *Prunty v. Post Oak Bank*, 493 S.W.2d 645 (Tex.Civ.App.—Houston [14th Dist.] 1973, writ ref'd n.r.e.). State Farm contends that it met its burden by producing evidence of an arson triangle: motive, opportunity and incendiary origin. In viewing the evidence the jury could well conclude that the Simmons did not have a motive to burn their home. Certainly, if the jury determined no motive on the Simmons' part, State Farm's circumstantial proof of arson fails. *See, Texas Gen. Indem. Co. v. Speakman*, 736 S.W.2d 874 (Tex.App.—Dallas 1987, no writ). The jury heard evidence that the

Simmons were not as far in arrears on their mortgage payment as State Farm attempted to indicate. Evidence further showed that a complete recovery of the policy limits would be insufficient to pay off the mortgage balance.

State Farm attempted to show that the Simmons had the opportunity to set the fire and that the fire was of incendiary nature. According to State Farm, opportunity involves the question of accessibility and timing. When State Farm denied the Simmons' claim, State Farm had concluded that the Simmons' house was "secured" and that the Simmons had the keys to the house. Furthermore the Simmons had left shortly before the fire started. State Farm concedes that the locking of doors and windows was not necessarily significant or unusual. The Simmons testified that they left their home at approximately 2:00 a.m. The Simmons did not recall the exact time they left adding that they had no reason to pay attention to the specific time. At the time State Farm denied the Simmons' claim, State Farm had not determined the time that the fire started. We think it elementary that an effort to determine the approximate time of the fire would begin with an interview with the person who reported the fire. It was not until shortly before trial, some years after the fire, that the person who originally reported the fire was located. State Farm, in locating Ms. Lawrence, made effort to determine the time of the fire more precisely. Ms. Lawrence did not have a watch at the time she discovered the fire and had no idea how much time passed between the time she discovered the fire and the time she was able to get a neighbor to allow her access to a telephone. Ms. Lawrence estimated that it took ten to fifteen minutes from the time that she first discovered the fire to report same to the fire department. State Farm's fire investigator, Richard Downing, estimated the amount of time the fire had burned from the reporting to the arrival of the fire suppression team to be approximately 30 to 45 minutes. Mr. Downing conceded that his estimates at trial were "off-the-cuff." The jury was ultimately given a time frame within which to deal of

anywhere up to an hour and twenty minutes after the Simmons had left their home.

The original report made by the fire investigator was to the effect that, "[t]he condition and position of the lock in the regular locking mechanism [of the den] could not be established due to the amount of damage found." Also, no evidence of forced entry could be established due to the heavy damage throughout the area. State Farm's fire investigator acknowledged that forced entry to set the fire was an equal possibility to State Farm's theory that the Simmons set the fire. State Farm knew even before it denied the Simmons' claim that its own fire investigator could not refute the possibility of a forced entry to the Simmons' residence, and that the fire chief could not tell whether one area of the house was in fact secure.

State Farm contends that the incendiary character of the fire was established by Investigator Downing. Downing's conclusions were inconsistent with the conclusion of others. The fire chief who supervised the fire suppression team, having fourteen years of experience, did not find the fire suspicious upon arrival. The chief testified that in his opinion the fire was a "slow" or "old" fire, not consistent with a fire started with accelerants, and more consistent with an accidental, electrical fire. The chief's testimony becomes even more significant since Mr. Simmons had advised Mike Hvasta of unrepaired electrical problems in the den. Mr. Downing testified that he had eliminated electricity and appliances as a cause of the fire. He further testified of failing to document the shorts in the electrical system. Mr. Downing did not know how many electrical connections there were in the den or whether the wiring in the den, an addition to the house, was installed properly. This testimony may well have been significant to the jury in light of the evidence of the heavy burning of one wall behind the den paneling. Downing did not know nor did he determine the loading factors or fuel load in the fire. This was, according to the Montgomery County Fire Marshal, something that should be determined through proper investigation.

Suffice it to say that State Farm never presented direct evidence that the Simmons set fire to their home. Its proof was circumstantial in nature. Even though circumstantial evidence may sufficiently support a burden of proof, State Farm failed in that burden. Even if this circumstantial evidence clearly supported the fact of arson, such evidence was insufficient to connect the Simmons with the arson case.

*Polasek* adequately explains the difference between a bad faith cause of action and an arson defense. We agree with the San Antonio Court that in a suit concerning State Farm's arson defense to the suit on the insurance contract, "the issue is whether the [insured] Polasek's set the fire." 847 S.W.2d at 286. In our case, as in the *Polasek* case, the jury failed to find that the homeowners set the fire. *Polasek*, however, puts us only a step away from the requirement of accepting an insurer's outcome oriented investigation even on the arson issue by simply asking if there was evidence in existence before the insurer that the insured committed the act of arson.

The evidence was undisputed that the Simmons suffered a total loss as to their home and contents. The total insurance coverage provided to the Simmons was $75,200. The coverage on the home itself was $47,000 and the contents had a $28,200 coverage. The evidence was clearly sufficient to support the jury's award of $75,000 in actual damages. Appellant's points of error three, four and five are overruled.

Appellant's points of error six, seven, eight and nine relate to the jury's award of punitive damages in several regards. State Farm first challenges the jury's findings that it acted with conscious indifference, a necessary predicate for an award of punitive damages. State Farm says that the jury award of $2,000,000 was and is excessive and in the absence of a remittitur, same is unconstitutional. State Farm attacks the $2,000,000 punitive damage award first on a no-evidence ground. State Farm says also that the trial court abused its discretion in failing to order a remittitur.

■ Punitive damages may be awarded where evidence establishes an entire want of care and shows that the defendant's conduct was the result of conscious indifference to the rights or welfare of the plaintiff. *See, General Motors Corp. v. Saenz*, 829 S.W.2d 230, 248 (Tex.App.— Corpus Christi 1991, writ granted). Whether conscious indifference exists requires no higher standard of proof than that of a preponderance of the evidence. *Id.* This is so although it is an inquiry into the mens rea of a defendant. *See, Transportation Ins. Co. v. Moriel*, 814 S.W.2d 144 (Tex. App.—El Paso 1991, writ granted).

■ We now look at the evidence presented to the jury in support of appellees' conscious indifference claim against State Farm. We first look at State Farm's "SIU" investigation. Realizing that Mr. Simmons' character was at issue once he denied setting the fire, SIU made no inquiry of Mr. Simmons' employer. Hvasta defended this position by simply stating that he, "didn't think [his employer] would give him a bad report...." When confronted with the question of why SIU did not contact Ms. Lawrence, the fire reportee, Hvasta's response was that he did not know which paper she threw in this small Montgomery County community. State Farm's excuses for not locating other potential suspects were also glaringly lacking. State Farm's position was basically that such investigation was not important or that even if they found a potential suspect, that suspect would not give them any information.[1] We acknowledge at this point in our opinion we are again confronted with the *Polasek* holding. We believe that our jury was entitled to infer from the evidence before it that State Farm did not care to determine who might be the arsonist, if in fact it was arson, but solely directed its resources to attaching the arson label to the Simmons. The jury also heard evidence as to the techniques used by SIU and the State Farm lawyer. This was accomplished by examining the insured under oath without the benefit of documents, records, or a transcript of their prior recorded statement nor disclosure that there were conflicts or unresolved questions and by misrepresenting facts to the insured. The jury may have also inferred conscious indifference on the part of State Farm in failing to obtain a detailed statement from the fire marshal, whose official report was changed from "undetermined" to "suspicious," even though the fire marshal never ruled or determined that the Simmons had any involvement in starting the fire.

Perhaps the most telling evidence of State Farm's indifference, or rather conscious indifference, was reflected in the Claim Committee Report. Prior to denying the Simmons' claim, State Farm determined that the Simmons, if they were to obtain insurance benefits, would have to fight State Farm for such benefits. Nowhere in the Claim Committee Report, which was the culmination of its entire investigation, did that committee position that the Simmons burned their home. State Farm believed that any claim brought by the Simmons would be "defensible." According to the record, defensible meant a favorable venue, the strength and availability of counsel, and other factors non-related to the truth of the arson accusation. State Farm mistakenly believed that the Simmons would have to show at trial that someone other than themselves had burned their home.

Further evidence of conscious indifference was shown by State Farm's failure to pay the V.A. mortgage coupled with its discovery that the information given them by the Simmons was essentially correct. Hvasta merely positioned that he misinterpreted the V.A. information. Prior to denying the Simmons' claim, State Farm made no effort to bring to its insured's attention the discrepancies in information. With State Farm's discovery that some of its investigative conclusions were erroneous, State Farm made no effort to revisit its denial. The jury was entitled to infer from State Farm's conduct and other evidence presented during this lengthy trial that State Farm's actions were intentionally wrongful and consciously and callously

---

**1.** Query: Would not give them *any* information or the *right* information?

in disregard of the Simmons' rights as a policyholder. From the evidence, it becomes apparent that State Farm viewed and treated their insureds, the Simmons, as adversaries as opposed to policyholders to whom State Farm owed a duty of loyalty and special trust.

Mr. and Ms. Simmons lost virtually all of their material possessions in the fire. The record shows that after State Farm denied their claim, the Simmons' marriage suffered and they separated. The record reflects that Ms. Simmons was devastated. Mr. Simmons felt defeated. The Simmons were embarrassed, humiliated and felt a sense of anger and betrayal. The jury awarded the Simmons a total of $200,000 for their mental anguish damages. From the record before us we believe that the evidence preponderates that State Farm began its investigation with the result to be reached. Here lies the true danger in *Polasek*. Under *Polasek* the evidence obtained by the State Farm investigation would clearly establish a reasonable basis for denying the Simmons' claim. Given only the evidence accumulated by State Farm, State Farm could only come to one conclusion, i.e., denial of the Simmons' claim.

Appellees contend that State Farm's handling of the Simmons' claim involved even more egregious conduct than that found sufficient to uphold the conscious indifference finding in *Thomas*, 825 S.W.2d at 148. In *Thomas*, as here, the insurer's investigation was less than objective and outcome oriented. In our case State Farm pursued leads which were unfavorable to the Simmons, but did not pursue leads which might indicate that someone else with motive set the fire. State Farm repeatedly failed to disclose to its own insureds, its suspicions or conflicts in the information it had obtained. Appellees contend, and we do not disagree, that State Farm's conduct was even worse than the conduct in *Thomas*, in that State Farm did, in a calculating manner, set forth to build and establish its defense even before the claim was denied.

State Farm attacks the amount of punitive damages as being unconstitutional.

The constitutionality of punitive damages has been upheld by both our United States Supreme Court and our Texas Supreme Court. *See, Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *State Farm Mut. Auto Ins. Co. v. Zubiate*, 808 S.W.2d 590 (Tex. App.—El Paso 1991, writ denied); *General Motors Corp.*, 829 S.W.2d at 248.

We have no clearly defined line for determining whether exemplary damages are excessive. We have no set formula, rule or ratio to precisely show a required relationship between actual damages and exemplary damages. As a general rule exemplary damages lie within the discretion of the jury. *Thomas*, 825 S.W.2d at 148; *Transmission Exchange Inc. v. Long*, 821 S.W.2d 265 (Tex.App.— Houston [1st Dist.] 1991, writ denied). We believe that the law requires that exemplary damages have some reasonable relationship to actual damages. Whether punitive damages are excessive depends upon the particular facts of a particular case. *See, Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908 (Tex.1981); *Moriel*, 814 S.W.2d at 150. In reviewing the award of punitive damages, appellate courts should pay close heed to the nature of the wrong for which punitive damages are intended to compensate. We must also, from the evidence, consider the character of the conduct. Further, we must review the evidence in an effort to establish that degree of culpability on the part of the alleged wrong-doer. State Farm was the sole chauffeur of its investigative limousine. State Farm embarked upon its journey treating the insureds as adversaries. The Simmons fully cooperated with State Farm and quietly sat in the back seat as mere passengers. State Farm had the limousine, the fuel and all of the resources necessary to take it to its intended destination. Along this journey, the Simmons continually gave suggestions as to other directions and turns to their chauffeur. State Farm chose to make no turn or deviation from its programmed course, but rather drove straight forward to its preconceived objective. Appellees tell us that State Farm's conduct offends a public sense of justice and propriety, citing

*Kraus*, 616 S.W.2d at 910. It is apparent to this Court that the jury below, which heard all of the evidence, and observed the demeanor and credibility of the witnesses, concluded that State Farm's conduct was at least offensive to their sense of justice and propriety.

 We shall not set aside a jury's award of punitive damages as excessive where there is probative evidence in support thereof. *See, Transmission Exchange*, 821 S.W.2d at 272. A remittitur is proper where the evidence is factually insufficient. *See Zubiate*, 808 S.W.2d at 605. We do not believe this to be a case demanding of remittitur and we do not find an abuse of discretion by the trial court in denying State Farm's request for remittitur. Points of error six, seven, eight and nine are overruled.

 Points of error ten, eleven and twelve focus upon the evidence both legally and factually, which appellant contends will not support the jury's findings on Question Nos. 4, 5 and 6. Question 4 is an inquiry as to whether State Farm violated the Deceptive Trade Practices Act, and instructs the jury on three specific types of violations. In order to answer No. 4 affirmatively, the jury must believe from a preponderance of the evidence that State Farm engaged in unconscionable conduct or false, misleading or deceptive acts or practices, or misrepresentations regarding rights or obligations under the insurance contract.

Factually, the homeowners insurance policy sold by State Farm to the Simmons contained a Mortgage Clause and listed the mortgagee as the Administrator of Veterans' Affairs. This contractual provision required State Farm to make payments directly to the V.A. in the event the policyholder's claim was denied. Hvasta acknowledged State Farm had no defense to the payment of the policy limits to the V.A. At the time of trial, some five to six years later, State Farm had still failed to pay the Veterans' Administration. The V.A., as a result of State Farm's failure, foreclosed on the Simmons' property in October 1987 leaving the Simmons with a deficiency of more than $62,000. Although State Farm represented it would pay the lien holder, it never did. This evidence would support the jury's finding of unconscionable conduct. *See, Allied Gen. Agency, Inc. v. Moody*, 788 S.W.2d 601, 606 (Tex.App.— Dallas 1990, writ granted).

The Simmons were informed by SIU Superintendent Tabor that State Farm would continue its investigation beyond the date of denial. Tabor also represented to Mr. Simmons that if the information that State Farm had gathered was clarified regarding the mortgage, State Farm would come back and pay the claim. Even after receiving the correct information from the V.A., there was no further contact with the Simmons nor was the Simmons' claim ever paid. Tabor represented that State Farm had done a "rather extensive investigation" other than on Mr. Simmons and "checked out rather thoroughly" the "other suspects." The evidence before the jury showed that neither State Farm nor its investigators, with all its resources, ever contacted the other suspects. This "rather extensive" investigation did not include contacting the person who reported the fire, interviewing the initial fireman on the scene, looking at the criminal records on the "suspects," considering the motive of others, or determining from Mr. Simmons' employer and others what kind of person Mr. Simmons was. The jury was entitled to believe from the evidence that State Farm's actions or inactions constituted unconscionable conduct or was false, misleading or deceptive.

State Farm began its investigation with suspicion. State Farm sent a letter to the Simmons' called a "Reservation of Rights" letter. This letter provided, in relevant part, that:

> There is a question as to whether this company is obligated under the policy for the loss ... because:
>> "It is questionable whether the cause and origin of this loss was accidental in nature."

This letter was false and misleading in that State Farm's obligation to pay this loss existed regardless of whether the loss

was "accidental" in nature, so long as the insured was not responsible for setting the fire. State Farm recognizes that a component of appellees' complaint at trial was State Farm's failure to "fully share the results of its investigation," protesting that it never made a secret of its investigation. The failure on the part of an insurer to share with its insured information regarding the insured's investigation can be considered unconscionable, deceptive and misleading under the Deceptive Trade Practices Act. Evidence of such conduct may be shown by the insurer's taking advantage of the insured's lack of knowledge and inexperience, misleading the insureds into believing that the insurer is attempting to help its insured, when in reality the insurer is seeking to establish a basis for reasonable denial of the insured's claim.

Throughout the course of State Farm's investigation, State Farm did not disclose to the Simmons that they were suspect nor that State Farm believed that the Simmons' had motive to burn their home. The Simmons had no obligation to investigate the circumstances of the fire bringing about their loss. This obligation rested upon State Farm. The Simmons relied upon their insurer to undertake and pursue a thorough, fair, objective and detailed investigation.

The jury was instructed that "knowing" conduct encompasses actual awareness on the part of State Farm of the falsity, deception or unfairness of its actions. Evidence shows that regardless of a duty to disclose material fact, State Farm clearly did not disclose the conflict between the erroneous information it received from the V.A. and that which was supplied by Mr. Simmons relating to mortgage payment and arrearage. Tabor's statement to Mr. Simmons regarding the "extensive" investigation of other suspects was not only erroneous, but was made with actual knowledge that an investigation of other suspects was cursory at best. Tabor also told the Simmons that State Farm's activities did not reflect "any criminality" on Mr. Simmons' part. This was a false statement because arson and insurance fraud is a crime. The evidence was sufficient for the jury to determine in Question No. 6 that State Farm's conduct was done knowingly.

The record showed more than a scintilla of evidence in support of the jury's affirmative findings to Questions 4, 5 and 6. Considering and weighing all the evidence, the jury was entitled to find from the evidence, either singly or in combination, that State Farm's conduct was in violation of the Deceptive Trade Practices Act, committed knowingly, and was a producing cause of the damages to plaintiff. Appellant's points of error ten, eleven and twelve are overruled.

Having overruled all of appellant's points of error the judgment of the trial court based upon the jury's findings is in all things affirmed. We decline to address the Simmons' cross points.

## CONCLUSION

We are of the opinion that the *Polasek* case is the beginning of the end of a common law cause of action against insurers for bad faith denial of insurance coverage to their insureds. If an insurer must now only satisfy its own corporate mind set that an insured brought about or caused their own loss, then we have whittled away yet another avenue of recourse for the people.

Our attack on *Polasek* is certainly not intended as attack on our great San Antonio Court of Appeals. Quite the contrary, for an in depth reading of *Polasek* highlights legal scholarship if not just down right brilliance. Our basic concern, consternation and fear results from ultimate effect. If *Polasek* be law, all that is required of an insurer on virtually any claim made by an insured, is to generate selective evidence sufficient to say, "here is the evidence in existence before *us.*" It matters not that such evidence was sought and obtained with outcome predetermined.

We believe that the effect of *Polasek* will be twofold. First, those duties now required by law which demand a relationship of trust from the insurer to its insured are diminished if not destroyed. Now, the insurer need only justify a denial of coverage to itself. Now, insurers, at the inception of

a claim, may view all their policyholders as arsonists, thieves and frauds so long as the insurer satisfies its corporate self that *"its"* evidence justifies denial. Secondly, we believe *Polasek* to be in direct contradiction of *Aranda*. *Aranda* established the "standard of care" relating to the denial of benefits. The first element of the *Aranda* test or standard is the requirement of an objective determination of whether a reasonable insurer under similar circumstances would have delayed or denied the claimant's benefits. *Polasek* leaves this determination to the insurer, not a factfinder or a factfinding body.

*Polasek* is in conflict with not only *Aranda*, but also *Arnold* and virtually every court of appeals opinion referenced in *Polasek*.

Perhaps the reasoning of our opinion is archaic in an era rapidly approaching the year 2000 A.D. Perhaps large entities should be the sole determinator of their own righteousness. Perhaps we don't need jurys to say, "we think the corporation's conduct was unreasonable."

There is an old axiom, not in law, unspoken, but perhaps underlying all equitable principals, which holds: "What's sauce for the goose is sauce for the gander."

Would it be absurd to suggest, that when an insured makes a claim, the reasonableness of such claim rest in the mind of the insured? Ludicrous? Not so for the goose, only for the gander.

Having overruled all of appellants' points of error the judgment of the trial court is in all things affirmed.

AFFIRMED.