John LUNDY, et ux, Appellants,

v.

ALLSTATE INSURANCE COMPANY, Appellee.

No. 09–88–229 CV.

Court of Appeals of Texas, Beaumont.

June 22, 1989.

Kevin Baird, Nederland, for appellants.

Erik E. Ekvall, Dallas, for appellee.

OPINION

BROOKSHIRE, Justice.

Appeal from a jury verdict adverse to John Lundy and his wife. In a juried proceeding the fact-finders returned this verdict:

"SPECIAL ISSUE NO. 3

"Do you find from a preponderance of the evidence that the fire in question was intentionally caused by any act, design or procurement on the part of the Plaintiffs?

"Answer: 'We do' or 'We do not.'

"Answer: We do".

The verdict was unanimous by a vote of all twelve of the jurors.

### The Background of the Litigation

The district court litigation was initiated and prosecuted by John and Winona Lundy, as plaintiffs, against Allstate Insurance Company, alleging a breach of contract among other salient allegations. The litigation was to recover money proceeds claimed to be due to the Lundys under a fire insurance policy issued by the Appellee to cover the home of John and Winona Lundy. The insurance company filed an answer alleging that the fire in question was intentionally set in some manner by the plaintiffs to collect fraudulently the proceeds of their fire insurance policy with Allstate. Allstate further alleged that the fire in question was not an accidental fire.

At the threshold we perceive there are two main versions in the record. One version of the evidence or the facts was brought out by the Lundys. A separate version or narration of the evidence or the facts was placed before the jury, under the careful rulings of the trial judge, by Allstate. We conclude that material, ultimate and controlling fact issues were raised and that the jury meaningfully decided the litigation against the Lundys. Under the record, we affirm.

### The Voir Dire

Beginning with the voir dire, the record reflects that the litigants recognized that the principal issue was what caused the fire or what actually started the fire. In his opening statement to the seated jury the attorney for the Lundys stated that the jurors would hear testimony about the value of the house, the market value of the house and the cost of repairs from both sides. He stated that one of the questions that would be asked was whether the house was totally destroyed or how much it was going to cost to repair the structure. He further stated that the next question would be whether or not Mr. and Mrs. Lundy set the fire, stating that this question was the whole crux of the case. He explained further that the jury was going to hear that there was probably no dispute that the cause of the fire was some person pouring a flammable liquid on the floor of the house. The contention of the Appellants was that they were away from the house that night and that some stranger broke into the house and for whatever reason, either vandalism, theft, or other reasons, poured this flammable liquid over the floor of the house and set the fire. A second issue was whether or not the structure was totally destroyed, this being an acknowledged subsidiary issue.

### The Defense Attorney's Contentions

The defense attorney also stated that there would be one issue having to do with the valuations in dispute and whether or not the house was totally destroyed. The defense counsel also stated that the main question in the case was whether or not the Lundys' claim was a fraudulent one. The defense lawyer unequivocally said that Allstate believed and had pleaded that the Lundys actually caused the fire.

### The Lundys' Financial Status

John and his wife, Winona, were owners of a house situated in Vidor, Orange County, in March of 1986. Before that date the Lundys had been issued a policy of insurance by Appellee, Allstate, providing fire coverage for the house. On March 12, 1986, while the policy of fire insurance was in effect, a fire occurred at the insured premises. The fire caused serious damage to the dwelling structure as well as some contents contained in the home. A claim for the insurance proceeds was promptly and properly filed. An extensive investigation into the circumstances followed. Allstate declined to pay the claim.

Unfortunately, John had been unemployed for some time—approximately two years. The family had necessarily been

required to live on the somewhat limited income of Winona. The Lundys had attempted, without success, to sell their house and lot during the two years before the fire. It had been listed by the real estate agent for $39,500. No sale was effected. For some duration of time before the date of the fire, John and his wife had been experiencing financial difficulties. The gas utility company had disconnected the gas over a dispute of an unpaid gas bill. The Lundys had contended there was a leak in the gas line and that the bill was too high. The leak was also outside of their house. During the next winter, they heated the house with wood using a wood-burning stove. John had cut the wood to heat the house. There had also been a dispute with the water utility company. At one point Winona stated that there was simply not enough money to pay the water bill and the water was turned off. Later, for some period of time, the Lundys had run a hose—apparently a garden hose of some type—to a neighbor's house to use the neighbor's water.

The Vidor State Bank had given notice to John to make his payments on the house current. These payments were on a loan which was secured by the house and lot. Winona acknowledged that at the time of the fire they were behind on the house note at the bank. Less than two weeks before the fire, a number of items were transported from the house to a mini-storage warehouse. John had attempted to earn some extra money during his unemployment in a wood cutting business. The two chain saws he used were not destroyed in the fire. Winona's gross monthly income from her employer, a Beaumont jewelry company, was approximately $850 a month. She took home about $332 on the first of the month and about $200 on the fifteenth. Her takehome pay per month was about $532, being the only steady income of the family. The record clearly reflects that there was a monthly note due at the Vidor State Bank in the amount of $168.89 on a second lien on the house. There was an additional note due monthly in the amount of $257 secured by the first lien on the house. There was a separate

car note in the amount of about $158. There were monthly phone bills ranging from $30 to $60. There was a $36 monthly bill owed to Palais Royal. These monthly notes come to an approximated figure of $665 per month. Then, of course, there were general living expenses. John's estimated income from his wood cutting business was estimated at around $7,000 per year. This was a rough estimate and was said to be between five and seven thousand dollars. Some garage sales were held by the Lundys.

### Events Prior to the Fire

A short time before the fire, approximately one week, the Lundys had moved certain additional items of personal property from the home, including cherished family photographs. Also, the record reflects that on the evening or the afternoon before the fire, a member of the Lundy family had purchased certain Coleman fuel which was testified to as being similar to that which was recovered by District Fire Marshall John Paul Feeley by means of samples taken from areas that were adjacent to certain pour patterns.

At a time shortly before the fire John and Winona and their daughter Kathleen, accompanied by Mrs. Lundy's brother, Oscar Posey, and Posey's lady friend left the house. They drove to McDonald's to get a bite to eat. The McDonald's was located about five or six blocks from the house. Oscar's car was loaded with his belongings. He was planning to make a trip to California beginning early the next morning. The group stayed at McDonald's quite a while because they ate and also had two or three cokes. The group continued to visit and talk. Then the group went down North Main Street to what is described as the Vidor Auction. This auction was located about a mile from the McDonald's. It was in the opposite direction from the house. The auction was closed. The group turned around and started for the home. On the way they stopped and purchased gasoline for the automobiles.

When the group arrived back at the house, the fire department was already

there and in the process of fighting the fire.

### The Testimony of Fire Marshall Feeley

Mr. Feeley was associated with the Orange County Fire District. As a fire marshall his primary duty was to determine the cause of all fires within his district which was defined as comprised of about 120 square miles situated in the western portion of Orange County.

Feeley had many years of fire service experience. He stated that he had received training in all of the various aspects of his duties. He stated that he was three quarters of the way through a degree program at Lamar University in a course known as fire science technology, which amounted to probably 800 hours of training. He had already taken a course at the fire recruit academy through Lamar College, requiring approximately 365 hours of study. He had attended other programs sponsored by Texas A & M University, the Beaumont Fire Department, the United States Coast Guard, the United States Navy, and other governmental units. He attained and possessed a fire marshall's certificate through the Texas State Fireman's and Fire Marshall's Association certification board. He was present at the fire on the night of the fire at the home of the Lundys. He assisted in extinguishing the fire, and also in investigating the fire.

He observed the color of the flames. The flames, he saw had a deep reddish tint or color. He testified that the deeper the reddish color was, the more likelihood existed of a hydrocarbon of some kind being involved. He testified that a hydrocarbon was something derived either from crude oil, gasoline, or kerosene, fuel oil, motor oil, or anything of that nature. He testified that the smoke he saw was heavy and banked almost down to the floor of the house. He testified that these signs and observations told him that the fire was fairly fast and roaring and that the fire had been banked down. The smoke was heavy and the fire was starving for oxygen and a lot of the fuel was not being consumed. Black smoke tends to indicate a hydrocar-

bon fuel fire. He performed an actual cause and origin investigation into the cause of the Lundys' fire. We could detail at considerable length the fire marshall's testimony. However, it would not add to the opinion. He took the photographs which were introduced into evidence.

The fire marshall swore that one of the photographs taken at the bedroom end of the hallway shows the beginning of a pour pattern. He testified that a pour pattern is an indicator of some flammable liquid that had been poured on the rug or the floor and then ignited. He testified that a pour pattern is a very strong indicator of a deliberate fire. He identified other pour patterns. He testified, for example, concerning a certain run. On either side of the pour pattern there appeared to be relatively little damage to the run. He testified that much of the fire damage was confined to the pour patterns themselves. He testified that other photographs depicted the black area as being solidly burnt and black. These photographs indicated to him a lot of flammable liquid had been poured continuously. He further testified that one photograph showed an "arcing" effect whereby the container of the liquid was poured out in an arced or thrown manner, instead of the container being tipped and poured in a straight line.

Feeley spoke of a tool which he described as a pragmatic tool known as a hydrocarbon detector, being a very sensitive instrument, that detects hydrocarbon vapors. He used the hydrocarbon detector in his investigation of the fire and that sensitive instrument registered hydrocarbons present. This investigation lead him to take certain samples. He locked these samples in the evidence safe which was actually in an area of his own vehicle. They were transferred to a laboratory for analysis. Sample 1 was tested and found to be very strong with a hydrocarbon characterized as gasoline or similar to gasoline. Sample 2 was characterized as gasoline but to a lesser amount. The Armstrong Laboratories performed the analysis which were certified to by an Andrew T. Armstrong, Ph.D., certified chemist, who was connected with the Armstrong Forensic Labo-

ratory, Inc., located in Arlington, Texas. The Forensic Laboratory's written report was placed in evidence before the jury. Feeley summed up his testimony by stating that in his opinion, based on his experience, the fire was set in two different locations. Slightly later in the record, he repeated his opinion that the fire was a set fire. He gave his reasons for his expert opinion. His opinion was also to the effect that the fire was an intentionally set or incendiary fire. He defined an incendiary fire as a fire that would be deliberately set or deliberately started by someone.

### The Testimony of Troy Standley

Standley's occupation was that of a coordinator of fire technology at Lamar University in Beaumont. He had been awarded an Associate Degree or a two year degree in fire protection technology. He taught a fire fighter's certification program that is required by the State of Texas for fully paid fire fighters. This program is a ten week, forty hour course, covering 28 subjects. He had taught at seminars. He had a law degree from the Baylor University Law School. Standley testified that he completed law school but decided that he did not want to practice law. He then became a special agent for the Federal Bureau of Investigation. He received specialized training in the investigation and documentation of fires and explosions, beginning in the mid–1950's. The documentation and investigation of fires at this time resulted, he said, because of certain racial tensions that existed in Arkansas, Mississippi and Alabama.

The Attorney General of the United States had assigned jurisdiction of fires and explosions in churches and schools to the FBI. After Standley left the FBI, he said he became a full time employee as a special agent with the Fraud and Arson Division of the National Board of Fire Underwriters. In this employment he spent ten years in documenting fires and explosions and teaching local law enforcement and fire service arson investigators the proper procedures for documenting fires, investigating fires, and documenting explosions and investigating explosions. He had

spent 29 years in the investigation of the causes and origins of fires.

Standley investigated the fire in litigation about 31 or 32 days after the fire. Standley observed the pour patterns. His testimony was that someone obviously had taken a container of flammable liquids and poured the same on the carpet, down the middle of the hallway, and also around the coffee table in the middle of the living room, and also into the kitchen. Standley swore that they were obvious pour patterns and that he could just see it and observe it. His opinion was that the fire in litigation was an intentionally set fire. He was not permitted to testify as to the probable motive behind a fire. At a later time, he testified that he had opinions and actually taught what some of the differences were between different fire scenes that he had examined as to motives. He testified to about ten or twelve identifiable motives or reasons why people deliberately set fires. Four of these motives are called leading motives and are fairly identifiable. He testified the most prominent motive numerically was juveniles being motivated to set fires. These are usually set by the juvenile acting alone in a hidden area where the juvenile had been playing with matches.

He testified that the second leading motive or reason is to cover a crime such as a burglary or an embezzlement or a murder. Generally, he testified, if a person sets the fire in an area of a burglary, it is usually set in a chest of drawers, and the fire is set where the burglary occurred. Usually the drawers will be open and there will be some valuable items missing.

Also, he swore a third leading cause or motivation of people setting fires is for insurance money or profit. He testified that generally in this type of fire a large quantity of flammables, being a gallon or more, is generally used and the flammables are used in several rooms or several locations. He testified that the motive or intention was for the building to be totally destroyed by fire so that the assured could receive total insurance coverage.

The fourth leading cause is the motivation of spite, anger, hatred, revenge or jealousy. There are sympathy fires where the wife sets fire if her husband has left her. There is the terroristic fire-setter who is a member usually of some terroristic group. This usually involves a fire-bomb or the blowing up of a building or a car.

Standley was not permitted to testify as to what category or type of fire the actual fire at the Lundys' home fell into. He was, however, permitted to testify that in his opinion his investigation failed to indicate that there was any burglary connected with the fire in question; nor were there any acts of vandalism involved.

### The Appellants' Contentions for Reversal

■ The Appellants seek a reversal and remand contending that the trial court erred in admitting the testimony of Troy Standley concerning the different motives for setting fires and the methods in which an expert could discern motives. We conclude that many of the answers made by Standley were responses to questions of fact. As an example, Standley was asked about his teaching background. He qualified as an expert and as such he could testify as to the motives for setting fire generally. Standley was not allowed to testify as to his opinion or his specific opinion concerning the Lundys, nor did he testify concerning the determination of how motives could be ascertained in the actual, instant litigation. Without belaboring the point, we think that *TEX.R.CIV. EVID. 702* determines this point against the Appellants. Rule 702 is captioned "Testimony by Experts" and provides generally that if scientific, technical, or other specialized knowledge will assist the trier of facts—here the jurors—to understand the evidence and to determine a fact in issue, then a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereunto in the form of an opinion or otherwise. We conclude that Standley's testimony qualified fully under Rule 701 and was admissible before the jury. Indeed, Rule 701, bearing the caption "Opinion Testimony by Lay Witnesses" provides in general that if a witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are rationally based on the perception of the witness and are helpful to a clear understanding of his testimony, or to the determination of a fact in issue. His testimony, subject to the weight given it by the jury, could be considered to be helpful to a clear understanding of his evidence and also to a determination of a fact in issue. There was no error.

The Lundys also argue that the trial court erred in admitting certain evidence concerning the circumstances surrounding Winona's dismissal from her job following the fire in question. We simply read the record in a different manner. Winona did not testify concerning the circumstances surrounding her dismissal from her job with the jewelry stores. There was an inference as to some irregularities at the store that were not permitted before the jury. There was a hearing outside the presence of the jury. It is true that later the defense was permitted to ask Winona if she had ever worked for the jewelry store after the fire. The Statement of Facts glaringly sets forth that she was asked a question generally to the effect that:

"Q Before this fire, ma'am, a week or two before this fire, you were aware that you were going to lose that income from Gem Jewelry,—

"A No, sir.

"Q —were you not?

"A No, sir.

"Q Did you not tell me that earlier in an examination under oath?

"A No, sir.

An objection was then made by her counsel which was sustained by the district judge. In this Appellant's point of error there is a complaint made against a sidebar remark made by Mr. Sandbote, but this statement or sidebar remark was made during a twenty minute recess outside the presence of the jury. Mr. Sandbote was explaining his theory to the district judge sitting alone as to why a prior, sworn,

written statement of Mrs. Lundy was admissible. We decide that this contention is without merit.

After the jury returned to the courtroom, Mrs. Lundy was asked a question to the effect that after the fire that she no longer worked and had not worked for the Gem Jewelry Company since the date of the fire. She responded: "No, I have not worked for them." We do not look upon this one question and one answer before the jury as constituting error. It was certainly not reversible error. In the argument under this point no authority, decisional or otherwise, is cited to us showing error. We have considered this fragmentary bit of testimony in relationship to the entirety of the record before us. We are not of the opinion that the matter complained of amounted to such a denial of the rights of the Appellants as was reasonably calculated to cause and probably did cause a rendition of an improper judgment in this case. *TEX.R.APP.P. 81(b)(1)*.

### The Appellants' Last Two Points of Error

■ The Appellants' last two points of error contend that there was no evidence to support the jury's affirmative answer to Special Issue 3, and that the jury's affirmative answer to Special Issue 3 concerning any intentional act, design or procurement of the fire on the part of the plaintiffs is against the overwhelming weight and preponderance of the evidence. We disagree. We have attempted to carefully review and analyze the entire Statement of Facts and the Exhibits before us. We have attempted to apply the accepted standards of appellate review. When passing on a "no evidence" point of error, we must consider only the evidence and the reasonable inferences from that evidence which support the verdict of the jury. We must, at the same time, disregard all evidence, testimony and inferences therefrom, that are to the contrary. The landmark, watershed case is *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). See *International Armament Corp. v. King*, 686 S.W.2d 595 (Tex.1985); *Nasser v. Security Ins. Co.*, 724 S.W.2d 17

(Tex.1987). Stated in somewhat different language, an appellate court in deciding a "no evidence" point should consider only the evidence and the reasonable inferences therefrom which viewed in their most favorable light supports the jury finding. And we must reject all evidence and all reasonable inferences to the contrary. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400 (Tex.1981). If there is any evidence of probative force or value to support the jury verdict, then we must affirm the jury's verdict. We are not a super jury or a super finder of the facts. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965). There are a virtual legion of circumstantial evidence that we view as having probative force to support the jury's verdict when challenged by a "no evidence" point. Furthermore, the trial judge properly instructed the jury that a fact may be established by circumstantial evidence or direct evidence or by both. His instruction on circumstantial evidence was correct. No objection was made to the trial court's instruction and definition on circumstantial evidence.

Nor was the jury's answer to Special Issue 3 against the overwhelming weight and preponderance of the evidence. The criteria for review to be used by an appellate court when passing on the question of whether the jury's verdict was against the overwhelming weight and preponderance of the evidence is to consider all the evidence and all the reasonable inferences that flow therefrom. After such consideration, it becomes our task to determine whether the verdict of the jury is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. Again, see *In re King's Estate, supra; Cain v. Bain*, 709 S.W.2d 175 (Tex.1986); *Dyson v. Olin Corp.*, 692 S.W.2d 456 (Tex.1985). If we decide that the jury's verdict is clearly wrong and manifestly unjust, we must follow and adhere to the guidelines and write the opinion in accordance with the dictates of *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex. 1986). We conclude we cannot properly do so. See also generally, R. Calvert, " 'No Evidence' and 'Insufficient Evidence'

*Points of Error*", 38 TEX.L.REV. 361 (1960), and W. Garwood, *"The Question of Insufficient Evidence on Appeal"*, 30 TEX.L.REV. 803 (1951).

The intermediate Courts of Appeals have jurisdiction to settle the sufficiency of the evidence on an issue of fact. *TEX. CONST. art. V, sec. 6; Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646 (Tex. 1988). Intermediate appellate courts should undertake to exercise their fact jurisdiction solely to prevent a manifest unjust result and a clear wrong. We are not at liberty to reweigh the evidence and to re-evaluate the credibility of the witnesses. We are definitely not empowered to set aside a jury verdict because the intermediate jurists feel that a different result would be more reasonable or more desirable. *Parsons v. Parsons*, 722 S.W.2d 751 (Tex.App.—Houston [14th Dist.] 1986, n.w. h.).

■ Arson or the intentional setting of a fire or an incendiary fire, may be established by circumstantial evidence. *Garrett v. Standard Fire Ins. Co. of Hartford, Conn.*, 541 S.W.2d 635 (Tex.Civ.App.—Beaumont 1976, writ ref'd n.r.e.). This Ninth Court in *Garrett, supra*, at 638, wrote:

"The crime of arson, being in defiance of law, is ordinarily conceived in secrecy and executed in such a manner as to avoid detection and exposure; and proof of such an unlawful enterprise must, in the very nature of things, be made by circumstances, and every circumstance which tends to cast light upon the incident is legitimate and proper."

Under the entirety of the record before us, we are unable and unwilling to say that the verdict of the jury was manifestly unjust and clearly wrong. We affirm the judgment.

AFFIRMED.