**LIBERTY MUTUAL FIRE INSURANCE COMPANY, Appellant,**

v.

**Donald CRANE, Appellee.**

**No. 09–93–296 CV.**

Court of Appeals of Texas, Beaumont.

Submitted Feb. 16, 1995.

Decided May 11, 1995.

Michael R. McGown, Michael K. Rose, Weller, Green, McGown & Toups, Beaumont, for appellant.

John H. Seale, Seale, Stover, Coffield & Bisbey, Jasper, for appellee.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

STOVER, Justice.

This is an appeal by appellant, Liberty Mutual Fire Insurance Company, of a judgment rendered against it for breach of a settlement agreement incorporated in a consent judgment in a Workers' Compensation case and for breach of its duty of good faith and fair dealing. After a trial on the merits, the jury found that appellant failed to provide medical treatment as provided for in the agreed judgment, and that appellant was consciously indifferent in failing to act fairly and in good faith. The jury assessed actual damages, attorney's fees, and punitive damages.

### Background Facts

The plaintiff-appellee, Donald Crane, was injured on December 19, 1990, when a light fixture fell and struck him on the left side of his neck while he was working as a scaffold carpenter for Yeargin, Inc. at the Gulf States Utilities power plant in Bridge City, Texas. When he fell, appellee struck his hands on the grating on which he was working. Notice of Injury was filed with the Industrial Accident Board and, subsequently, a Workers' Compensation lawsuit was filed which alleged "injury to his head, neck, right shoulder and body generally." The appellee was treated by a doctor on the day of the accident and saw several other doctors thereafter for treatment of pain and injuries to the cervical spine.

On February 25, 1991, Liberty Mutual requested that the Texas Workers' Compensation Commission order an examination of appellee to be performed by Dr. Clark Gunderson of Lake Charles, Louisiana, an orthopedic specialist selected by Liberty Mutual. Dr. Gunderson first examined Crane on April 9, 1991, and had him hospitalized for a series of diagnostic tests. One of the diagnostic tests included a nerve conduction study that revealed evidence of a right carpal tunnel syndrome (CTS).

On May 5, 1991, Dr. Gunderson performed surgery on a ruptured disc in Crane's neck. In a letter to Liberty Mutual dated May 14, 1991, Dr. Gunderson discussed the surgery and noted "a mild carpal tunnel syndrome on the right." The history that Dr. Gunderson had previously elicited from the appellee included the information that appellee had begun to experience tingling and paresthesia (numbness) in his right hand at or shortly after the December 1990 accident and that appellee had never had that kind of problem before the accident.

In July 1991, Crane filed a Workers' Compensation lawsuit against appellant, which suit was settled on or about November 18, 1991. The trial court entered an agreed judgment on December 11, 1991. Under the express terms of the settlement agreement, Crane received $59,000 from the appellant and voluntarily relinquished his right to lifetime medical in lieu of an agreement that Liberty Mutual would be responsible for Crane's medical expenses "proximately caused by the industrial injury" for five years. The agreement also provided that medical care would be "under the direction and control of Dr. Clark A. Gunderson or a doctor mutually agreed upon by all parties."

Subsequent to the agreed judgment of December 11, 1991, Crane sought authorization from Liberty Mutual in January 1992 to pay for carpal tunnel surgery on his right wrist. Maintaining that the carpal tunnel syndrome (CTS) was not related to the December 1990 accident, Liberty Mutual denied Crane's request. According to Liberty Mutual, its position was confirmed by medical experts and by Crane's own notice of injury, which described the injury as being "injury to my head, neck and right shoulder."

Crane contends that Liberty Mutual breached the settlement agreement, since Dr. Gunderson on three separate occasions

had stated that it was his opinion that the carpal tunnel syndrome was caused by the original injury and that surgery was necessary. Subsequent to appellant's failure to authorize payment for the carpal tunnel release procedure, appellee filed the instant lawsuit on March 31, 1992, alleging breach of the settlement agreement, breach of the duty of good faith and fair dealing, unfair and deceptive practices under Article 21.21 of the Insurance Code, and conscious indifference to appellee's rights. Appellee pled for recovery of three times the amount of his damages, for exemplary damages, and for reasonable attorney's fees.

### Appellant's Points of Error One and Two

In Question No. 1, the jury was asked whether the defendant failed to provide plaintiff with medical treatment as contracted for in the November 18, 1991, settlement. To this question, the jury responded "yes." Appellant brings forth the complaint that there was no evidence, or, in the alternative, insufficient evidence to support the jury's finding. In response to Question 2, the jury found the damages from such failure to be $6,000.

■ In reviewing a "no evidence" point, we must consider only the evidence and inferences that support the jury's findings and we must disregard all evidence and inferences that do not support the jury's findings. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965). We must sustain a "no evidence" point when the record discloses one of the following: (1) evidence of a vital fact is completely absent; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *Juliette Fowler Homes, Inc. v. Welch Associates,* 793 S.W.2d 660, 666 n. 9 (Tex.1990).

Where reversal is sought on the ground of insufficiency of evidence to support a jury finding or on the ground that the finding is against the great weight and preponderance of the evidence, these standards govern:

(a) The court of appeals must consider and weigh all of the evidence and should set aside the verdict *only* if it is so contrary to the overwhelming weight of the evidence as to be *clearly wrong and unjust;*

(b) The court is not free to reweigh the evidence and set aside a jury verdict merely because the judges feel that a different result is more reasonable. The court may not substitute its thought processes for those of the jury; and,

(c) The court must be prepared to detail the evidence relevant to the issues under consideration and clearly state why the jury findings are factually insufficient or are so against the great weight and preponderance of the evidence as to be manifestly unjust, why the findings shock the conscience, or why the findings clearly demonstrate bias. The court must be able to state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict.

*Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex.1986); *Pool v. Ford Motor Co.,* 715 S.W.2d 629 (Tex.1986); *Dyson v. Olin Corp.,* 692 S.W.2d 456 (Tex.1985); *Garza v. Alviar,* 395 S.W.2d at 823; *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951).

■ Appellant contends that it did not breach the provision of the settlement agreement in the Workers' Compensation case concerning medical treatment of Donald Crane, since Crane's carpal tunnel syndrome (CTS) was not related to the December 1990 injury. However, the record contains ample evidence that Crane had the condition of CTS, that the condition developed shortly after the accident, that he had never had it prior to the accident, and that the doctor chosen by the carrier found it to be related to the December 1990 injury. This information came from a variety of sources:

(1) Dr. Gunderson's report of April 9, 1991, to Liberty Mutual in which he

stated that Crane had paresthesias (numbness) to his right hand;

(2) Dr. Gunderson's May 14, 1991, letter to Liberty Mutual in which Dr. Gunderson reports a mild CTS on the right;

(3) Three (3) nerve conduction tests (EMGs), each with positive findings of right CTS, which were performed at Dr. Gunderson's direction in 1991 and paid for by Liberty Mutual;

(4) Crane's deposition, taken on September 20, 1991, by Liberty Mutual's attorney in the Workers' Compensation case.

In summary, the evidence shows that by the time the contact came from Dr. Gunderson's office in February 1992 for authorization to perform carpal tunnel surgery on Crane, Liberty Mutual had already selected Dr. Gunderson in February 1991 as its doctor under Workers' Compensation Commission rules; had authorized and paid for surgery where Dr. Gunderson initially planned to operate on both Crane's neck and his wrist (for CTS); had authorized and paid for nerve conduction studies which showed the presence of CTS; had received testimony and reports tying the carpal tunnel syndrome to the original injury; and had agreed in the December 1991 consent judgment to "open medical" under the direction of Dr. Gunderson for five years.

In reference to the naming of Dr. Gunderson as the physician to determine the medical needs of appellee, the testimony of Ms. Lisa Gilbert, the adjuster who negotiated and approved the settlement agreement, becomes relevant:

Q Wasn't it a customary thing with Liberty Mutual and with claims that you were handling that when it came time to settle the case that if at all possible you tried to negotiate so that you would limit the medical to some particular doctor, as opposed to leaving it carte blanche as to any doctor? Wasn't that frequently done?

A Yes.

During the testimony of Ms. Gilbert, she admitted that the insurance company would not have approved treatment by other doctors if it hadn't been recommended or approved by Dr. Gunderson:

Q Okay. Now, if it's not a mutually agreed upon and it's somebody you never have heard of, and then I came—I, as an attorney, said, I want Dr. Jones out here or Dr. Smith out here to see this man, and Dr. Smith now has seen him and he says he's got X,Y,Z problems, you pay for it. Now, wouldn't you say, wait a minute, you didn't have authority to send him to Dr. Smith or Dr. Jones because I didn't agree to it and it wasn't Dr. Gunderson or anybody Dr. Gunderson recommended? Isn't that exactly what you'd say?

A Yes.

The evidence is clear that not only was Dr. Gunderson the choice of Liberty Mutual, but also that Crane was restricted to Dr. Gunderson (or someone mutually agreed upon by the parties) for all medical care related to the accident. That was Liberty Mutual's intent, as expressed in the testimony of Lisa Gilbert and as expressed in the agreed judgment. Although requested to do so by Dr. Gunderson and by Crane and his attorney, Liberty Mutual refused to authorize the CTS surgery, which fell within the parameter of the medical care provision of the settlement agreement.

 This suit is based on a settlement agreement that was incorporated into an agreed judgment. Because a consent judgment is a written agreement, it should be interpreted as a contract with general rules relating to construction of contracts applicable. *Threet v. Texas Employers' Insurance Ass'n*, 516 S.W.2d 276 (Tex.Civ.App.—Tyler 1974, no writ). Despite its contractual nature, however, it is more than a mere contract; it has the same degree of finality and binding force as one rendered by a court at the conclusion of adversary proceedings. *Barrientes v. Harlandale Ind. School D.*, 764 S.W.2d 28 (Tex.App.—San Antonio 1989, writ denied). The agreed judgment provided that Liberty Mutual would pay all reasonable and necessary medical expenses proximately

caused by the industrial injury. With ample evidence in the record demonstrating the causal relationship between the December 1990 accident and Crane's CTS, the jury had sufficient grounds to conclude that Liberty Mutual failed to provide Crane with medical treatment as contracted for in the November 18, 1991, settlement. In failing to provide and pay for the carpal tunnel surgery, Liberty Mutual failed to abide by the terms of the agreement and, in so doing, breached the settlement agreement.

Accordingly, we find that the evidence is sufficient to support the jury's finding in regards to Liberty Mutual's breach of the settlement agreement. We, therefore, overrule appellant's points of error one and two and affirm the judgment for medical costs and attorney's fees.

### Appellant's Points of Error Three and Four

■ Having found that appellant Liberty Mutual breached the settlement agreement with Donald Crane, we next review the question of whether the insurance company also breached its duty of good faith and fair dealing. In points of error three and four, Liberty Mutual contends that the trial court erred in finding that it failed to act fairly and in good faith when it denied authorization for Crane's carpal tunnel syndrome surgery. Appellant couches its arguments in terms of "no evidence" points and, in the alternative, insufficient evidence points.

The duty of good faith and fair dealing in the context of insurance companies' dealings with their insureds was recognized by the Texas Supreme Court in *Arnold v. National County Mutual Fire Insurance Co.*, 725 S.W.2d 165, 167 (Tex.1987), and was extended to workers' compensation carriers in *Aranda v. Insurance Co. of North America*, 748 S.W.2d 210, 213 (Tex.1988). The question of whether Liberty Mutual breached that duty is one of the central issues in this case.

■ A claimant who alleges breach of the duty of good faith and fair dealing must establish:

1. That there was an absence of a reasonable basis for denying or delaying payment of the benefits of the policy. *National Union Fire Ins. v. Dominguez*, 873 S.W.2d 373 (Tex.1994.) (This element requires an objective determination of whether a reasonable insurer under similar circumstances would have delayed or denied the claimant's benefits. *Aranda*, 748 S.W.2d at 213); and

2. That the carrier knew or should have known that there was not a reasonable basis for denying the claim or delaying payment of the claim. *Dominguez*, 873 S.W.2d at 376. (The second element is met by establishing that the carrier actually knew that there was no reasonable basis to deny the claim or by establishing that the carrier, based on its duty to investigate, should have known that there was no reasonable basis for denial. *Aranda*, 748 S.W.2d at 213.). According to *Dominguez*, 873 S.W.2d at 376, the second element is an attempt to balance the right of an insurer to reject an invalid claim and the duty of the carrier to investigate and pay compensable claims.

■ As explained by the Texas Supreme Court in both *Lyons v. Millers Cas. Ins. Co. of Texas*, 866 S.W.2d 597, 600 (Tex.1993), and *Dominguez*, the bad faith cause of action does not focus on whether the claim is valid. *Lyons* 866 S.W.2d at 600. Coverage is not the issue in a bad faith claim. On the contrary, the focus in a bad faith cause of action is on the reasonableness of the insurer's conduct in rejecting the claim. As applied to the instant case, that simply means that the mere fact that the settlement agreement covers Donald Crane's carpal tunnel syndrome surgery does not necessarily mean that the carrier has also breached the duty of good faith and fair dealing.

■ In both *Lyons* and *Dominguez*, the Texas Supreme Court set out the standard for a legal sufficiency review in bad faith cases. In reviewing the legal sufficiency of

the evidence supporting a bad faith finding, the appellate court's focus should be on the relationship of the evidence supporting the bad faith claim to the elements of bad faith. *Lyons,* 866 S.W.2d at 601. Evidence presented, viewed in the light most favorable to the prevailing party, must be such as to permit the logical inference that the insurer had no reasonable basis to delay or deny payment of claims, and that it knew or should have known it had no reasonable basis for its actions.

In a challenge to the factual sufficiency of the evidence, we must consider all of the evidence. *Lofton v. Texas Brine Corp.,* 720 S.W.2d at 805; *Pool v. Ford Motor Co.,* 715 S.W.2d at 635. We cannot set aside a jury finding unless it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Garza v. Alviar,* 395 S.W.2d at 823; *Lundy v. Allstate Ins. Co.,* 774 S.W.2d 352, 358 (Tex. App.—Beaumont 1989, no writ).

In light of those standards, we must look at what evidence Donald Crane brought forward to support his claim of bad faith and, more specifically, his claim that Liberty Mutual had no reasonable basis to deny his claim. He offered, among other things, the expert opinion of Dr. Gunderson, the physician who was actually selected by the insurance company to handle medical care related to Crane's injury and to handle future medical for settlement agreement purposes. In Dr. Gunderson's opinion, Donald Crane did, indeed, have carpal tunnel syndrome; moreover, Dr. Gunderson found the condition to be related to the injury in question. Dr. Gunderson affirmatively stated this opinion in the February 3, 1992, letter which he wrote to Liberty Mutual. Furthermore, Crane offered evidence of three EMG (nerve conduction) tests performed upon him in April, October, and December 1991 by two physicians other than Dr. Gunderson. All three EMG tests revealed that Crane suffered from carpal tunnel syndrome, and all three tests were authorized and paid for by Liberty Mutual. In addition, Crane testified by deposition in September 1991 that he

began experiencing numbness and tingling in his right hand shortly after the accident and that he continued to experience those symptoms thereafter. Based upon the foregoing EMG tests, Dr. Gunderson's letter, as well as his deposition testimony, and Donald Crane's own deposition testimony, the carrier was put on notice that Crane was afflicted with carpal tunnel syndrome and that the condition resulted from the accident on December 19, 1990. With that information in hand, there was, at that point, no bona fide controversy regarding the insurer's liability; the carrier's own expert stated that the carpal tunnel syndrome was related to the accident and recommended surgery to correct the problem.

The jury concluded that the carrier had no reasonable basis for denying the claim, and further concluded that Liberty Mutual knew that it did not. The circumstantial evidence in the case regarding the conduct of Liberty Mutual, through its adjusters, John Ledbetter and Lisa Gilbert, supports the jury's findings on that issue. Once Dr. Gunderson requested authorization for carpal tunnel syndrome surgery on Crane, Liberty Mutual assigned a new adjuster to the case, John Ledbetter, who was more experienced in dealing with CTS, at least the most common form of CTS stemming from repetitive trauma. Ledbetter was not a medical doctor. Although Ledbetter had in hand the three EMG tests, Dr. Gunderson's written opinion as to the causal relationship between the injury and Crane's CTS, Dr. Gunderson's request for authorization for the carpal tunnel surgery, and Crane's own deposition testimony, that body of evidence was not enough.

Rather than accept the ample evidence of the relationship between the injury and the CTS and the necessity of surgery to correct the CTS, Ledbetter pressed on in dogged pursuit of a predetermined course of action to deny the claim. In view of the substantial evidence that he already had before him, which a reasonable insurer under similar circumstances would have deemed sufficient, he needed either a reversal by Dr. Gunderson of

Gunderson's opinion or an opposing opinion by other experts. He made repeated telephone calls to Dr. Gunderson to discuss the claim. When Dr. Gunderson remained firm in his opinion, the record shows that the adjuster next wrote a letter to a Dr. Thorpe, in which Ledbetter asked if carpal tunnel syndrome could result from the injury in question or whether it was more likely that the carpal tunnel syndrome stemmed from Crane's repetitious use of his hands while working as a boilermaker. Dr. Thorpe did not reply directly to the questions posed in the letter, but merely stated in a handwritten comment on the letter, "No dx of carpal tunnel syndrome when I saw him." The record shows that, unlike Dr. Gunderson, who saw Crane twenty times, Dr. Thorpe saw Crane only one time, did no diagnostic studies on him, and undertook no treatment.

Continuing to disregard the three positive EMGs, the testimony of Donald Crane, and the opinions and recommendations of its own expert, Dr. Gunderson, Ledbetter sought still another opinion—this time from a Dr. Epstein. Like Dr. Thorpe, Dr. Epstein saw Donald Crane one time for approximately five minutes and, likewise, did no diagnostic studies. In his opinion, at the time he examined Crane, Dr. Epstein was unsure that Crane had carpal tunnel syndrome. As Dr. Epstein stated:

> I am aware of the electrodiagnostic abnormalities that have been determined.
>
> Quite honestly, I'm not exactly clear why he has the right upper extremity complaints that he is telling us about.... [He should] be evaluated by a diagnostic neurologist.... [I]t would not be my advice that the man undergoes a carpal tunnel release surgery at this point in time....
>
> The way that Mr. Crane related hitting his extremity on grating would not, in my opinion in all probability, yield a carpal tunnel syndrome.

At that point, Liberty Mutual had in hand its much sought-after medical opinion in opposition to that of Dr. Gunderson. With the contradictory opinion in hand, appellant, no doubt, believed that it had acquired sufficient "reasonable basis" to deny the claim and thereby avoid any breach of its duty of good faith and fair dealing.

The facts in this case distinguish it from *Lyons* and *Dominguez*, at least in terms of the existence of a breach of the duty of good faith and fair dealing. In both *Lyons* and *Dominguez*, the insurance companies had initial reports from their own experts concluding that the carriers had no liability in the matters in question. In contrast to that set of circumstances, Liberty Mutual's own expert physician, Dr. Gunderson, concluded that the carpal tunnel syndrome was related to the injury and should be surgically corrected. He so informed Liberty Mutual of that fact by phone calls and letters. Ironically, however, the carrier was not satisfied with the opinion of its own expert and felt compelled to find another opinion which comported with its point of view.

Pursuant to the method of analysis outlined by the Supreme Court in *Lyons* and *Dominguez*, we have reviewed the evidence before the carrier relating to the tort issue of no reasonable basis for denial of the claim:

1. Records of the first three physicians (Drs. Craig, Thorpe, Wood) who saw Crane;

2. Liberty Mutual's selection of Dr. Gunderson in its request for a board ordered exam in February 1991;

3. Dr. Gunderson's letter of April 9, 1991, to Liberty Mutual in which he stated that Crane had paresthesia (numbness) in his right hand;

4. Dr. Gunderson's letter of May 14, 1991, stating that Crane had mild carpal tunnel syndrome on the right;

5. Repeated statements in Crane's deposition in September 1991 that he had numbness and tingling in his right hand which began shortly after the injury;

6. Three EMGs in April, October, and December 1991, showing carpal tunnel syndrome in the right wrist;

7. Settlement agreement in November 1991 between Crane and Liberty Mutual in which Dr. Gunderson, or a mutually agreed upon doctor, was to provide the five year future medical care on medical problems related to the injury;

8. Dr. Gunderson's letter of February 3, 1992, stating that Crane had carpal tunnel syndrome which was "relative to the injury".

For some reason, the carrier determined that this "picture" was not complete. In this court's opinion, however, and, in the jury's opinion, it was. Since Liberty Mutual had tests indicating the presence of carpal tunnel syndrome in the right hand, had its own medical expert's opinion that the carpal tunnel syndrome was related to the injury, and had the statement of the insured as to the onset of symptoms shortly after the injury, the insurance company had no reasonable basis for denying authorization for the surgery.

Instead of fulfilling its duty to pay the claim, however, the carrier made a predetermination that the claim must be denied and then set upon a course of action to secure additional opinions to substantiate that predetermined course of action. Once it secured those opinions, Liberty Mutual denied the claim. In reviewing the conduct of Liberty Mutual, the question ultimately comes down to this: Is it acceptable for an insurance company to continue to seek expert opinions under the buzz words of "clarification" and "investigation" until it finally secures one or two in opposition to its own experts? Or is there finally a point where it is patently unreasonable to deny the claim or to continue to delay payment? Surely, the intent of the Supreme Court in its pronouncements in *Lyons* and *Dominguez* was not to allow prolonged "fishing expeditions" for expert opinions to continue until a party finds one in opposition to those which it already has in hand. If, indeed, that is the case, then no carrier will ever be found to have breached the duty of good and fair dealing, since it can always locate an expert opinion somewhere to support its predetermined course of action.

In addition to the evidence before appellant when it made its decision not to authorize Crane's surgery, we have reviewed the evidence offered by Crane in support of his bad faith claim:

1. Selection by Liberty Mutual of Dr. Gunderson in its request for board ordered exam in February 1991;

2. November 1991 settlement agreement between Crane and Liberty Mutual;

3. Three EMG tests showing carpal tunnel syndrome in the right hand;

4. Letters and deposition testimony of Dr. Gunderson, as noted above;

5. Donald Crane's repeated statements in his deposition concerning the numbness and tingling in his right hand and their onset shortly after the injury;

The evidence offered by Crane in support of his bad faith claim, as well as the evidence which was before Liberty Mutual when it denied or delayed payment on the claim, furnish a reasonable basis for the conclusion by the jury that there was no reasonable basis for the denial of the claim. Our review of the relationship of the evidence supporting the bad faith claim to the elements of bad faith demonstrates that there is sufficient evidence to support both elements of the bad faith cause of action.

Under a legal sufficiency analysis outlined in *Lyons*, we are required to give weight only to the evidence supporting the judgment for Donald Crane and reject all evidence to the contrary. The evidence presented by Crane of an absence of a reasonable basis for denying the claim and appellant's knowledge of that fact, as well as the information before Liberty Mutual at the time it denied or delayed making a decision on the claim, is more than a scintilla of evidence and, indeed, in view of all the evidence, is both legally and factually sufficient.

We conclude that there is sufficient evidence of Liberty Mutual's breach of the duty

of good faith and fair dealing under both *Lyons* and *Dominguez.* We, therefore, overrule appellant's points of error three and four and affirm the judgment for damages for physical pain and mental anguish.

### Appellant's Points of Error
### Five, Six, and Seven

█ Having found that Liberty Mutual did, indeed, act in "bad faith," we now turn to the question of whether the $50,000 in punitive damages found by the jury are justified. Although each is couched in somewhat different terms, appellant's points five, six, and seven all have to do with the issues of gross negligence and punitive damages.

The Texas Supreme Court in *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10 (Tex. 1994), recently set out the standard for a review of punitive damages in bad faith insurance cases; it also modified the definition of gross negligence. *Moriel* holds that a finding of bad faith does not suffice in and of itself to justify an award of punitive damages. *Id.* at 23. Only when accompanied by malicious, intentional, fraudulent, or grossly negligent conduct does bad faith conduct justify punitive damages. *Moriel* specifically holds that an insurer's delay or refusal to pay an insured's claim, even when the insurer has no reasonable basis for doing so, is not gross negligence. It is bad faith.

The question in the instant case is whether or not the bad faith conduct of Liberty Mutual rises to the level of gross negligence, as that is defined in *Moriel:*

1. The defendant must have *actual awareness* of the extreme risk created by his conduct; (emphasis added)

2. Defendant's *conduct* must involve an *"extreme degree of risk,* a threshold significantly higher than the objective reasonable person for negligence."

*Id.,* 879 S.W.2d at 21.

█ That extreme degree of risk is not satisfied by a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of "serious injury" to the plaintiff. *Id.* at 22; *Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 327 (Tex. 1993). There must be a serious injury that is independent and qualitatively different from the breach of the insurance contract. *Moriel,* 879 S.W.2d at 24. "In general, though, an insurance carrier's refusal to pay a claim cannot justify punishment unless the insurer was actually aware that its action would probably result in extraordinary harm, not ordinarily associated with breach of contract or bad faith denial of a claim—such as death, grievous physical injury, or financial ruin." *Id.* at 24.

It is the opinion of this court that, under the evidence in the instant case, the conduct of Liberty Mutual does not rise to the extreme level of harm required by *Moriel,* and, consequently, we find the evidence to be insufficient to support the jury's punitive damage award to Crane. There was, in fact, no evidence that the carpal tunnel syndrome was life threatening, or that it was or would progress to the level of "grievous physical injury"; or that Liberty Mutual's failure to pay for the surgery to correct the CTS would result in Crane's financial ruin. Therefore, we sustain points five, six, and seven.

In accordance with this opinion, the judgment of the trial court is affirmed in part, and reversed in part. We affirm that part of the judgment awarding damages to appellant for breach of contract, for attorney's fees, and for breach of the duty of good faith and fair dealing. We reverse the judgment of the trial court on the issue of punitive damages and render judgment that Donald Crane take nothing on his claim for punitive damages. We, therefore, order that costs be assessed against appellant.

AFFIRMED IN PART; REVERSED AND RENDERED IN PART.