AETNA CASUALTY & SURETY CO.
and Larry Hendrick, Appellants,

v.

Carmela GARZA, Appellee.

No. 04–93–00237–CV.

Court of Appeals of Texas,
San Antonio.

July 31, 1995.

Rehearing Overruled Aug. 31, 1995.

Charles W. Hurd, III, Steve Pate, Fulbright & Jaworski, Houston, Ben Taylor, Fulbright & Jaworski, Dallas, Arnulfo Guerra, Sr., Guerra, Duvall, Ramirez & Guerra, Roma, Frank E. Weathered, Dunn & Weathered, P.C., Corpus Christi, Roberto L. Ramirez, Garcia & Ramirez, McAllen, Frank R. Nye, Jr., Law Offices of Frank R. Nye, Jr., Rio Grande City, for appellant.

Craig R. Zobel, J.A. Canales, Nancy M. Simonson, Canales & Simonson, P.C., Corpus Christi, for appellee.

Before RICKHOFF, LOPEZ and STONE, JJ.

STONE, Justice.

On August 19, 1990, a fire set by an arsonist destroyed the home and possessions of Carmela Garza.[1] At the time of the fire the home was the community property of Garza and her husband Raul Garza, although the two were separated and Raul Garza lived elsewhere. Garza brought this suit against her insurer, Aetna Casualty & Surety Company, and Larry Hendrick, an Aetna adjuster. Garza alleged causes of action for breach of contract, breach of the duty of good faith and fair dealing with malice, and knowing violations of the Deceptive Trade Practices Act (DTPA) and the Insurance Code. Aetna and Hendrick bring this appeal from a judgment on a jury verdict in Garza's favor.

Appellants raise legal errors only, seeking rendition or modification of the judgment. Appellants' primary contention is that there is no evidence that Aetna's resolution of the claim was anything other than reasonable. Appellants also challenge the damage findings made by the jury, and the award of damages as calculated by the trial court. We find the evidence legally sufficient to support the judgment pursuant to *Lyons v. Millers Casualty Ins. Co.*[2] and its progeny. We also find the pleadings and the evidence sufficient to support the award of damages under the Deceptive Trade Practices Act. For the reasons set forth below, however, we determine there is no evidence to support the award of punitive damages for malice. We also reverse and render the judgment as to appellant Hendrick, Aetna's adjuster.

## I. Standard of Review

In reviewing a "no evidence" or legal insufficiency point of error, we traditionally consider only the evidence and inferences that support the challenged finding, and we disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex.1988); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). The point of error must be sustained when the record discloses any one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the

---

1. "Garza" in this opinion refers only to Carmela Garza. Garza's husband will be referred to by his full name.

2. 866 S.W.2d 597 (Tex.1993).

evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990). If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

■ The Texas Supreme Court has written extensively in recent times in an effort to define more clearly the method by which courts should conduct legal sufficiency review of fact findings in bad faith suits against insurers. "A cause of action for breach of the duty of good faith and fair dealing is stated when it is alleged that there is *no reasonable basis* for denial of a claim or delay in payment or a failure on the part of the insurer to determine whether there is any reasonable basis for the denial or delay." *Arnold v. National County Mutual Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex.1987), *modified on other grounds, Murray v. San Jacinto Agency, Inc.,* 800 S.W.2d 826, 829–30 (Tex. 1990) (emphasis added). To establish an insurer's liability for the tort of bad faith the insured must prove: "(1) the absence of a reasonable basis for denying or delaying payment of the benefits of the policy *and* (2) that the carrier knew or should have known that there was not a reasonable basis for denying the claim or delaying payment of the claim." *Aranda v. Insurance Co. of North America,* 748 S.W.2d 210, 213 (Tex.1988) (worker's compensation case).

■ Plaintiffs in bad faith cases thus have the burden of proving a negative proposition, that the carrier knew or should have known it had no reasonable basis for denying the claim. *National Union Fire Ins. Co. v. Dominguez,* 873 S.W.2d 373, 376 (Tex.1994); *State Farm Lloyds, Inc. v. Polasek,* 847 S.W.2d 279, 284 (Tex.App.—San Antonio 1992, writ denied). The Supreme Court has announced a "particularized application" of the traditional no evidence standard of review to be employed in bad faith cases:

> [W]hen a court is reviewing the legal sufficiency of the evidence supporting a bad faith finding, its focus should be on the

relationship of the evidence arguably supporting the bad faith finding to the elements of bad faith. The evidence presented, viewed in the light most favorable to the prevailing party, must be such as to permit the logical inference that the insurer had no reasonable basis to delay or deny payment of the claim, and that it knew or should have known it had no reasonable basis for its actions. The evidence must relate to the tort issue of no reasonable basis for denial or delay in payment of a claim, not just to the contract issue of coverage.

*Lyons v. Millers Casualty Ins. Co. of Texas,* 866 S.W.2d 597, 600 (Tex.1993) (citation omitted). With these authorities as guidelines, a detailed review of the evidence is in order.

## II. Facts

Neither Raul nor Carmela Garza was home the night of August 19, 1990, when their house burned to the ground. Raul Garza spent the evening with friends at another residence where he was then living. Carmela Garza was out of town on holiday with her daughter and grandchildren until she was called about the fire.

Garza made a claim under the policy the day after the fire, and Aetna began its investigation. This investigation ultimately spanned two years. Aetna's investigation involved taking multiple statements from the Garzas and employing a series of people to inspect the property and make evaluations of the loss. Following these numerous interviews and inspections, Aetna delayed payment until it received examinations under oath from the Garzas.

Two days after the fire an independent claims adjuster retained by Aetna took a recorded statement from Garza and inspected and photographed the property. The adjuster, Richard Brebner, sent a report one month later to the Aetna adjuster in charge of Garza's claim, Larry Hendrick. Although Brebner had no suspects, his report suggested that Aetna perform "considerable and lengthy" background checks on Garza and her husband. The report noted that Raul Garza had a criminal background involving

drugs and "considerable financial holdings" with no readily explainable source of income. Brebner estimated the loss at $70,000, but stated that this amount might be insufficient.

Several days after the fire Aetna's origin and cause investigator, Joe Fenley, interviewed both Garzas and also inspected the fire scene. Fenley reported to Aetna on August 31 that the fire was definitely caused by arson. Fenley indicated that the Garzas might be involved, and recommended further investigation. Fenley testified that he had no specific information to implicate the Garzas, but he opined that Carmela Garza may have wanted the house destroyed so she could collect insurance proceeds, move to a new location, and thus no longer have to drive past the home where her estranged husband was living with a younger woman.

In September Garza called Aetna and was referred to Hendrick. Hendrick contended that he had been trying to reach Garza, but she contended that she had contacted Aetna because she had heard nothing from the company following the fire. When they spoke, Hendrick told Garza that a private investigator, Bob Park, would contact her to obtain a statement from her.

On October 1, 1990, Bob Park obtained recorded statements from each Garza, inspected the property, and secured written authorizations granting Aetna access to the property. He also provided them with a proof of loss form to complete. At the beginning of each interview Park explained that he was not an adjuster, and that the recorded statements were not equivalent to examinations under oath, which Aetna might request at a later date. Garza signed authorization forms giving Aetna access to the premises, and she permitted Park to inspect the premises. At trial Aetna asserted that it was unable to gain access to the property until March 19, 1991, when Hendrick visited the property.

On October 8, 1990, Hendrick sent Garza a "reservation of rights" letter based on the "cause of loss" and "correct scope of damages" clauses in Garza's policy. Aetna's attorney, Tim Herron, also sent the Garzas written notice that Aetna was exercising its right under the policy to take their examina-

tions under oath. The letter stated the Garzas had a right to legal representation, and requested they contact Herron to schedule an appointment. Even at the time of trial Herron claimed he was unaware that the Garzas had submitted to prior interviews with Brebner.

Garza hired Margil Sanchez to represent her, believing that the reservation of rights letter was a denial of her claim. On October 16, 1990, Sanchez sent a letter to Aetna requesting copies of Garza's policy, statements made by the Garzas about the fire, the authorization forms, and other items. Garza had previously informed Aetna's representatives that her policy was destroyed in the fire. Sanchez never received the requested documents. Rather, Aetna's attorney Herron responded to Sanchez' October 16 letter eight months later with a letter enclosing a copy of the declaration page from Garza's policy. The letter stated, "If you wish, I can obtain a similar form containing the language regarding Duties of the Insured in the Event of Loss."

Sanchez attempted to schedule an appointment for Garza's examination under oath. Sanchez and Herron corresponded back and forth in an effort to schedule Garza's examination under oath, but conflicts on both sides resulted in rescheduling. Hendrick noted in a status memorandum to Aetna regarding the claim that, "Our attorney, Tim Herron, has been playing cat and mouse with Mrs. Garza's attorney. They have set appointments to take Mrs. Garza's sworn statement on several occasions and ended up someone breaking the appointment." Each side testified that the other was uncooperative. Sanchez and Garza testified they were ready to proceed with the examination under oath provided Aetna furnished the policy and the other requested documents. Aetna indicated through its attorney that it could not continue its investigation until it obtained the examinations under oath of both Garzas. On one occasion Sanchez and Garza appeared for an examination under oath, but no one from Aetna appeared or called to cancel the appointment.

On January 3, 1991, Hendrick wrote the Garzas a second reservation of rights letter claiming that the Garzas had failed to fulfill all of their obligations under the policy because they had failed to fill out the proof of loss form within 91 days, provide access to the damaged property, provide an inventory of damaged personal property, and submit to examinations under oath. Hendrick also requested the inventory and permission to inspect the property. Hendrick himself visited the property on March 19, 1991. He estimated the settlement value regarding the structural loss at $30,000 and the value of the contents at $66,600. On March 28, Sanchez sent the contents inventory to Hendrick. That same day Hendrick also sent the Garzas $2,000 as an advance on the coverage of personal property so Garza could buy some clothes, seven months after the fire.

In the summer of 1991 Garza hired a new attorney, Tony Canales. Canales's associate, Craig Zobel, wrote a letter to Hendrick on July 17 contending that Garza had been unable to determine her rights and duties because her copy of the policy was lost in the fire and Aetna had not provided one in response to her requests. Zobel also enclosed a sworn proof of loss signed by Garza and concluded by demanding the policy limits of $111,000 on the dwelling and $66,600 on unscheduled personal property. A week later Zobel again informed Hendrick that despite Sanchez's requests, Aetna had not yet furnished Garza a copy of the policy.

Aetna's investigation focused solely on the Garzas and disregarded all other leads. Raul Garza had identified a young man who previously threatened to burn down a store owned by the Garzas, but Aetna did not investigate whether a third party had set the fire. Aetna's assistant claims manager explained that Aetna's self-defined role was "not to conduct an investigation as to who ultimately might or might not have been involved in setting the fire" because Aetna was concerned only with eliminating the involvement of the insureds in the loss. Brebner's report referred to a statement by the Starr County Fire Marshall that a Garza family member could have been involved. The report also mentioned a caretaker who "might know more about the loss than he reports." None of these leads was ever explored.

Eleven months after the fire destroyed her home and personal property, Garza filed a declaratory judgment action requesting the court to determine her rights with respect to her insurance policy and to find that Aetna was obligated to pay the policy limits. The petition was later amended to seek extracontractual damages for bad faith.

Aetna's refusal to produce the policy continued after Garza filed suit. Aetna filed a plea in abatement based on its inability to obtain examinations under oath from the Garzas. The court denied the plea in abatement and indicated Aetna could reurge its plea once it provided Garza a copy of the policy. Aetna acknowledged that Garza was entitled to a copy of her policy before giving an examination under oath, yet never provided a reason for its failure to provide a copy. The failure to provide a copy of the policy was not simply the oversight of one individual. Both Hendrick, Aetna's adjuster and Herron, Aetna's attorney, were aware of the on-going requests for a copy of the policy. Likewise, other members of Aetna's management team, including regional claims manager Charles McKeithen and unit manager Susan Hightower, were aware of Garza's requests for a copy of her policy. Aetna's management members were concerned that criticism might arise because of the delay, and by internal memos they emphasized the need for a plan and control over the claim. Nonetheless, Aetna persistently failed to provide a copy of the policy to Garza or to otherwise conclude the investigation.

Aetna's attorney ultimately sent Garza's attorney a copy of the policy when ordered to do so by the court, fourteen months after Garza's first attorney made the initial request. In the accompanying letter Aetna's attorney stated that the "basis of our defensive claims and non-payment [is that Aetna] has never had the opportunity to take the examination under oath."

Aetna took Garza's examination under oath in February 1992 and Raul Garza's in July 1992, four months after it received a court order allowing it to take his examination

under oath. A court order was necessary because Mr. Garza was serving a federal prison sentence in March 1991 for violating drug laws. In August 1992, two years after the fire, Aetna tendered a check to the plaintiff for $94,624.55. This amount included $28,624.55 for loss to the structure and $66,000 for contents. The home had been insured for $111,000 for structural damage and $66,600 for its contents.

## III. Findings of the Jury and Judgment of the Trial Court

The jury found that: (1) Garza's house was a total loss as a result of the fire, causing Garza $300,000 in damages; (2) Aetna and Hendrick breached their duty of good faith and fair dealing to Garza, causing her damages of $150,000, and (3) that they did so with malice, awarding $1,000,000 in punitive damages against Aetna only; (4) Aetna and Hendrick engaged in an unfair or deceptive act or practice in violation of the Insurance Code and the DTPA, causing damages of $150,000, and (5) that they did so knowingly, awarding $150,000 as additional damages against Aetna only; (6) Aetna and Hendrick engaged in an unconscionable action or course of action, causing damages of $150,000, and (7) that they did so knowingly, awarding $1,000,000 as exemplary damages against Aetna only.

Based on the jury award, the trial court awarded Garza $150,000 plus pre-judgment interest of ten percent as actual damages against Aetna and Hendrick jointly and severally for breach of the duty of good faith and fair dealing. The court also awarded a total of $1,545,229.10 against Aetna alone for: (1) DTPA damages of $340,768.20; plus (2) attorney's fees of $204,460.92; plus (3) common-law exemplary damages of $1,000,000 for breach of the duty of good faith and fair dealing with malice. Finally, the court awarded Garza post-judgment interest of ten percent on total damages and costs.

In eleven points of error, appellants challenge the legal sufficiency of the evidence to support the jury's findings, the definition of malice in the jury charge, the sufficiency of the pleadings on unconscionability, Hendrick's individual liability, and the court's calculation of damages. We shall first examine the common law causes of action, then the statutory causes of action, and finally the damages.

## IV. The Common Law Duty of Good Faith and Fair Dealing

In their first point of error appellants challenge the legal sufficiency of the evidence to support the jury's affirmative finding regarding breach of the duty of good faith and fair dealing. Aetna asserts that there is no evidence of bad faith on its part. Aetna claims that it had a right to withhold payment under the policy until it obtained the Garzas' examinations under oath, and that it promptly paid the claim once the examinations were taken. Aetna further claims that the facts before it justified payment of only $28,624.55 for structural damage. Finally, Aetna contends that at best Garza provided proof of Aetna's negligence, which is not proof of bad faith.

■■■ "[A]n insured claiming bad faith must prove that the insurer had no reasonable basis for denying or delaying payment of the claim, and that it knew or should have known that fact." *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 18 (Tex.1994); *Aranda v. Insurance Co. of N. Am.*, 748 S.W.2d 210, 213 (Tex.1988); *Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987), *modified on other grounds*, *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 829–30 (Tex.1990). The first element of this test requires an objective determination of whether a reasonable insurer under similar circumstances would have denied or delayed the claimant's benefits. The second element balances the right of an insurer to reject an invalid claim and its duty to investigate and pay compensable claims. *Arnold*, 725 S.W.2d at 167. The duty to investigate means that bad faith can occur when an insurer fails to determine whether there is any reasonable basis for the denial or delay of a claim. Under this test, insurers will not be subject to liability for an erroneous denial of a claim, but remain free to deny invalid or questionable claims. *Id.* While Aetna cautions that the tort of bad faith is not to be confused with negligence, the duty owed by an insurer to its insured is stated in

familiar negligence terms: the insurer owes that degree of care and diligence in handling the insured's claim which a person of ordinary care and prudence would exercise in the management of his own business. *Arnold,* 725 S.W.2d at 167.

In bad faith cases, however, the evidence must relate to the tort issue of no reasonable basis for denial or delay in payment of a claim, not just to the contract issue of coverage. *Lyons v. Millers Cas. Ins. Co.,* 866 S.W.2d 597, 600 (Tex.1993). As the Texas Supreme Court has stated:

> A legal sufficiency analysis requires the reviewing court to give weight only to evidence supporting the judgment for the insured and reject all evidence to the contrary. However, only after an appellate court has determined what potential basis an insurance company may have had for denying a claim can the court conduct a meaningful review of whether the insured has presented evidence that the insurer lacked a reasonable basis for denying or delaying the claim. The court may then apply the traditional rules of legal sufficiency review, giving weight only to evidence in support of the judgment.

*National Union Fire Ins. Co. v. Dominguez,* 873 S.W.2d 373, 376 (Tex.1994). Thus, the reasonableness of the insurer's conduct is inherently relevant to the bad faith determination. *See Lyons,* 866 S.W.2d at 600.

Coverage is not disputed in this appeal. To establish arson as a defense to a claim, the insurance company needs evidence that the insured had both a motive and an opportunity to set the fire, and that the fire had an incendiary origin. *See Polasek,* 847 S.W.2d at 282. In the present case, there was only evidence of the fire's incendiary origin. Aetna could not point to any evidence which would raise a suspicion that the Garzas had known about the impending fire, such as removal of family heirlooms or increase in insurance coverage shortly before the fire. As early as October 1990, Aetna's own investigators had ruled out any possibility that either Carmela or Raul Garza had the opportunity or motive to set the fire. Brebner closed his file in late September 1990, and had no evidence implicating either Garza. By mid-October Park had reviewed the criminal and financial status of the Garzas, inspected the premises, and interviewed various people, including both Garzas. He concluded then that the Garzas had neither the motive nor the opportunity to set the fire.

Aetna argues that its duty to thoroughly investigate the claim was not fulfilled until it had examined both Carmela and Raul Garza under oath, which was its right under the policy. Aetna's inability to obtain the examinations under oath was a situation created by Aetna itself when it failed to honor Garza's request for a copy of the policy. Aetna could have obtained the examinations under oath long before it did by providing Garza with a copy of her policy. Aetna's witnesses consistently acknowledged that Garza had a right to a copy of the policy and that the policy was the best source of information regarding her obligations. Aetna failed to provide Garza with a copy of her policy until required to do so by the court, despite repeated requests for more than fourteen months.

Aetna argues that "[t]he issue is whether *payment* was delayed without a reasonable basis, not whether *production of a policy* was delayed without a reasonable basis." This is correct. Nevertheless, if Aetna seeks to delay payment until its insured fulfills her obligations under the policy, it has the duty to furnish its insured with a copy of that policy upon request, so that she may know what her obligations are. In other words, is it reasonable for an insurer to withhold payment of a claim based on the insured's failure to comply with the terms of a policy when the insured has no copy of the policy and the insurer refuses to provide one. So put, the question answers itself. This is especially true since Aetna's own investigation failed to raise even a scintilla of evidence that would implicate either of the Garzas in the arson.

Aetna claims that the law mandates a thorough investigation by insurers, and that such an investigation is particularly important in arson cases, which must be proved circumstantially. There is no evidence, however, that Aetna was investigating or gathering facts to circumstantially prove anything. To

the contrary, Aetna never investigated several strong leads about the possible involvement of someone other than the Garzas. Rather, Aetna concentrated solely on the Garzas and disregarded evidence of a third party's possible involvement. Garza presented evidence that this course of conduct was in keeping with Aetna's arson awareness training program, which suggested that taking numerous statements from insureds increased the chance of forcing a contradiction in statements, thus giving rise to application of the fraud or false statement exclusion.

Aetna's conduct in targeting the insureds and ignoring other possible suspects is evidence that the jury could properly consider in determining the bad faith issue. *See State Farm Fire & Cas. Co. v. Simmons,* 857 S.W.2d 126, 133 (Tex.App.—Beaumont 1993, writ denied) (failure to investigate possible suspects identified by insured is bad faith); *Automobile Ins. Co. v. Davila,* 805 S.W.2d 897, 906 (Tex.App.—Corpus Christi 1991, writ denied), *overruled on other grounds, Hines v. Hash,* 843 S.W.2d 464, 469–70 (Tex. 1992) (failure to investigate possibility of faulty wiring despite repeated requests is bad faith). We are aware that the courts in *Simmons* and *Davila* applied a general no evidence review standard without incorporating the particularized standard established in *Lyons.* Nonetheless, these cases do support the proposition that a failure to investigate can constitute bad faith.

Aetna argues that it is undisputed there were facts before Aetna which, if believed, justified paying Garza only $28,624.55 for her structural damage. Aetna contends that its tender of this amount to Garza shows it acted reasonably and not in bad faith. The home was insured for a total of $177,600: $111,000 for structural damage and $66,600 for unscheduled personal property. The $28,624.55 amount tendered by Aetna was derived from a computer estimate of damages prepared by Hendrick. Hendrick, however, did not consider such factors as replacing damaged insulation, duct work, brick, and sheetrock, or testing copper pipe to see if it was still usable. He testified that due to the lack of electricity when he inspected the house, he was forced to do a "quick scope" of damages.

Hendrick himself did not lower the initial reserve of $80,000 after his investigation. Aetna's initial investigator recommended $70,000, and said that this amount might not be enough. The projected total loss was $146,000.

Disputes over actual damages are properly decided by a jury. *State Farm Lloyds, Inc. v. Polasek,* 847 S.W.2d 279, 284 (Tex.App.— San Antonio 1992, writ denied). The insurance company must have a good reason for its delay in payment or failure to pay the full amount due. The basis "cannot be fanciful or flimsy. Not just any asserted basis will suffice." *Polasek,* 847 S.W.2d at 287. Garza presented evidence that there was no reasonable basis for the delay and Aetna offered no evidence of a reasonable basis for its delay in payment or its failure to pay the full amount of damages. Rather, Aetna obtained several appraisals until it found a lower estimate it was willing to pay. The jury had a right to decide from this evidence that $28,624.55 was inadequate payment for the structural damage. While *Lyons* instructs us that evidence of coverage standing alone is not evidence of bad faith, in the instant case the evidence of coverage and the method Aetna used to determine the extent of the loss relate to *both* bad faith and coverage. *See Employers Nat'l Ins. Co. v. Dalros,* No. 04–92–00078–CV, —— S.W.2d —— [1994 WL 81435] (Tex. App.—San Antonio March 14, 1994, n.w.h.). Point of error number one is overruled.

## V. Individual Liability of Hendrick for Bad Faith

A defendant cannot commit a tort without first having a duty to the plaintiff to refrain from his actions. The duty of good faith and fair dealing applies to insurance carriers; it does not extend to the company's agents or contractors. *Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 696–98 (Tex.1994); *see also Ayoub v. Baggett,* 820 F.Supp. 298, 299–300 (S.D.Tex.1993); *Arzehgar v. Dixon,* 150 F.R.D. 92, 94–95 (S.D.Tex.1993); *Hartford Cas. Ins. Co. v. Walker County Agency, Inc.,* 808 S.W.2d 681, 686 (Tex.App.—Corpus Christi 1991, no writ). Appellants concede that the insurance company cannot delegate the duty of good faith and fair dealing be-

cause it has the contract with the insured. Hendrick was merely Aetna's adjuster and as such he owed no duty of good faith and fair dealing to Garza. Accordingly, the trial court erred in rendering judgment against Hendrick individually. We note that Hendrick responded to Garza's suit by filing a counterclaim, alleging that her suit was brought solely to harass him. The jury found his reasonable attorney's fees to be $150.00, but in light of the other jury findings, no recovery was awarded by the trial court. Hendrick does not complain of the lack of recovery on appeal. Point of error number two is sustained.

## VI. Statutory Causes of Action

Based on the jury verdict, the court awarded Garza $150,000 in actual damages. It also awarded her Deceptive Trade Practices Act (DTPA) damages totalling $340,768.20. TEX. BUS. & COM.CODE ANN. § 17.50(b) (Vernon Supp.1995).

Garza obtained jury findings pursuant to section 17.50 of the DTPA, which provides in pertinent part:

§ 17.50 Relief for Consumers

(a) A consumer may maintain an action where any of the following constitute a producing cause of actual damages:

(1) the use or employment by any person of a false, misleading, or deceptive act or practice that is specifically enumerated in a subdivision of Subsection (b) of Section 17.46 of this subchapter [or]

\* \* \* \* \* \*

(3) any unconscionable action or course of action by any person ...

TEX.BUS. & COM.CODE ANN. § 17.50(a) (Vernon 1987 & Supp.1995). Aetna contends that there is no evidence that it violated any section of the DTPA. In considering a "no evidence" or legal sufficiency point, we consider only the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d at 522; *Garza v. Alviar,* 395 S.W.2d at 823.

Aetna's fourth point of error argues that Garza's pleadings were insufficient to sup-port any recovery for unconscionable conduct under the DTPA. In the alternative, Aetna argues that there is no evidence that it acted unconscionably in handling Garza's claim.

In her petition, Garza makes the following allegations: She twice requested in writing a copy of her policy from Aetna, but neither Aetna nor its attorney furnished a copy until ordered to do so by the court. She made a claim under the policy for losses caused by the fire, but "Aetna consistently refused to comply with the requirements of the policy without providing a reason for denying coverage and thereby effectively denied coverage." Garza also alleged that the defendants engaged in unlawful, false, misleading, and deceptive acts, which included, among others, the following:

(a) Defendants represented that they would provide Plaintiffs with rights and remedies that they have not provided.

(b) Defendants represented that their services have qualities and characteristics which they do not have.

(c) Defendants have refused to furnish Plaintiff with a copy of her policy which was lost in the fire and thereby precluded her from determining her rights and obligations under the policy.

(d) Defendants conducted numerous inspections and tests in and around Plaintiff's home to the detriment of Plaintiff and then failed to apply the results of the inspections and tests in interpreting the aforesaid policy.

(e) Defendants knowingly failed to produce a copy of the policy upon repeated requests of plaintiff in an attempt to dissuade Plaintiffs [sic] from pursuing her claim and to cause certain policy conditions to lapse without Plaintiff being able to ascertain her rights and liabilities under the policy.

(f) Defendants have effectively denied coverage without a reasonable basis and without determining a reasonable basis for denial of Plaintiff's claim.

Garza also alleged that she mailed Aetna a notice of intent to file an action under the DTPA and the Insurance Code for the losses suffered due to its deceptive acts and breach

of its duty of good faith and fair dealing, which proximately caused her damages, including medical treatment and hospitalization. After setting out an alternative negligence pleading, Garza alleged in her twelfth paragraph that "the unlawful acts and practices described above ... constitute deceptive trade practices within the meaning of Section 17.46 of the Texas Business and Commerce Code and Section 21.21 of the Texas Insurance Code." Aetna did not specially except to this pleading.

 "A pleading will be liberally construed in favor of the pleader and is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim." *Troutman v. Traeco Building Sys., Inc.,* 724 S.W.2d 385, 387 (Tex.1987). In *Troutman* the Plaintiff pleaded one cause of action under the DTPA and facts which gave sufficient notice of a cause of action under another provision of the DTPA. The plaintiff was not barred from trying the second theory under the DTPA merely because another section had been plead. As long as one pleads facts giving rise to the statutory violation, specific statutory references are not required. *Padre Island Inv. Corp. v. Sorbera,* 677 S.W.2d 90, 94 (Tex.App.—San Antonio 1984, writ dism'd w.o.j.); *Ransopher v. Deer Trails, Ltd.,* 647 S.W.2d 106, 110 (Tex. Civ.App.—Houston [1st Dist.] 1983, no writ).

Aetna asserts that Garza's pleading gave no notice "of any unconscionability claim under section 17.50(a)(3)." The trial court disagreed and overruled defendants' objections to the introduction of evidence and to the submission of the jury questions of which they now complain.

Aetna argues that because Garza made specific reference to selected parts of the DTPA, but not to the unconscionability provisions, she did not plead unconscionability. Having seen reference to section 17.46, but not to section 17.50 or to the term "unconscionable," Aetna says it was prepared to defend laundry list violations but no others. It is true that of the lettered paragraphs we

have quoted, paragraphs (a) and (b) are specifically referable to TEX.BUS. & COM.CODE ANN. § 17.46(b)(7) and (b)(12) (Vernon Supp. 1995).

There is no cause of action under section 17.50 for the commission of "false, misleading, or deceptive acts or practices," however, unless those acts or practices are among those *specifically enumerated* in section 17.46(b). TEX.BUS. & COM.CODE ANN. §§ 17.46(d), 17.50(a)(1) (Vernon 1987). Thus, the only possible action Garza could maintain for false, misleading, or deceptive acts or practices is limited to the allegations in her paragraphs (a) and (b). Despite Garza's twelfth paragraph which mentions DTPA section 17.46 and article 21.21, paragraphs (c) through (f) and the remaining allegations of her petition must be referable to some other cause of action.[3]

The DTPA defines unconscionable conduct as an act or practice which, to a person's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree. TEX. BUS. & COM.CODE ANN. § 17.45(5)(A) (Vernon 1987). The allegations set forth in Garza's petition, especially in her paragraphs (c) through (e), quoted above, are sufficient to plead a cause of action for unconscionability. Point of error four is overruled.

 We turn now to the question of whether the evidence is legally sufficient to support the unconscionability finding and the deceptive act or practice finding. A showing under section 17.45(5)(A) that Aetna took advantage of a consumer's lack of knowledge to a grossly unfair degree requires proof that the resulting unfairness was "glaringly noticeable, flagrant, complete and unmitigated." *Chastain v. Koonce,* 700 S.W.2d 579, 584 (Tex.1985). The best source of information regarding the rights and obligations under an insurance policy is the policy itself. Aetna's own witnesses conceded that without a copy of a policy Garza would be at a disadvantage and would not know her obligations under the policy. They also conceded that it

---

**3.** An action may be brought under section 16 of article 21.21 for violations of section 17.46 of the DTPA, but not for unconscionable acts or practices. *Mobile County Mut. Ins. Co. v. Jewell,* 555 S.W.2d 903, 911 (Tex.Civ.App.—El Paso 1977), *writ ref'd n.r.e.,* 566 S.W.2d 295 (Tex.1978) (per curiam).

was reasonable for an insured to request a copy of her statements and her policy. Garza repeatedly requested a copy of her statements and policy in letters to Aetna. The requests were just as repeatedly ignored while Aetna continued to insist on Garza's adherence to the terms and conditions of a policy she did not have.

We conclude that this evidence was legally sufficient to show that Aetna took advantage of Garza's lack of knowledge to a grossly unfair degree. Likewise, the evidence reflects that Aetna knew within two months of the fire that neither Raul or Carmela Garza had a motive or opportunity to set the fire. Despite this knowledge, Aetna delayed payment for two years. Aetna's third and fifth points of error are overruled.

### VII. Damages

In reviewing the damage awards in this case we must keep in mind the Supreme Court's words:

> Our law recognizes a three-tier framework for measuring damages in an insurance coverage dispute, and each level is associated with distinctly different policies, substantive definitions, and measures of proof. A bad faith case can potentially result in three types of damages: (1) benefit of the bargain damages for an accompanying breach of contract claim, (2) compensatory damages for the tort of bad faith, and (3) punitive damages for intentional, malicious, fraudulent, or grossly negligent conduct. It is important to preserve distinct legal boundaries between the three bases of recovery to prevent arbitrariness and confusion at the critical thresholds.

*Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 17 (Tex.1994) (citing *Lyons,* 866 S.W.2d at 600).

### A. Common Law Punitive Damages

In order to recover punitive damages, the insured must prove that the insurance company's conduct was intentional, malicious, fraudulent, or grossly negligent. *Moriel,* 879 S.W.2d at 23 n. 16. Punitive damages are recoverable in bad faith cases upon a showing of the same elements that permit their recovery in other tort actions.

*Aranda,* 748 S.W.2d at 215; *Arnold,* 725 S.W.2d at 168. In the instant case, the jury found that Aetna acted with malice in breaching its duty of good faith and fair dealing.

Aetna argues that the definition of malice submitted to the jury will not support a recovery of punitive damages. Alternatively, Aetna argues that there is no evidence that it maliciously breached its duty of good faith and fair dealing. The jury was instructed as follows:

> "Malice" may be actual or implied. Actual malice exists when an act is done with ill-will, bad or evil motive, or with such gross indifference or reckless disregard to the rights of others as will amount to a willful or wanton act. Malice may be implied from a wrongful act which is intentionally done without just cause or excuse.

Aetna objected to this instruction because of its reference to "implied malice," and tendered its own definition:

> "Malice" means either conduct that is specifically intended by the defendant to cause substantial injury to the plaintiff or an act that is carried out by the defendant with a flagrant disregard for the rights of others and with actual awareness on the part of the defendant that the act will, in reasonable probability, result in substantial injury.

This definition is closer to our previous definitions of the actual malice necessary to support an award of punitive damages. *See Tribble & Stephens Co. v. Consolidated Servs., Inc.,* 744 S.W.2d 945, 953 (Tex.App.—San Antonio 1987, writ denied) (breach of contract and conversion suit); *Kidd v. Hoggett,* 331 S.W.2d 515 (Tex.Civ.App.—San Antonio 1959, writ ref'd n.r.e.). We need not determine, however, if the definition of "malice" given to the jury was deficient because we find that under either definition there is no evidence that Aetna acted with malice.

The mere fact that an act is intentional or legally wrongful will not support an award of punitive damages; the act must be intentionally wrongful, or must be motivated by ill will and a desire to injure the other party. *Automobile Ins. Co. v. Davila,*

805 S.W.2d 897, 909 (Tex.App.—Corpus Christi 1991, writ denied), *overruled on other grounds, Hines v. Hash,* 843 S.W.2d 464, 469–70 (Tex.1992). To justify an award of exemplary damages, the act complained of must go "well beyond that which justifies an affirmative finding of a breach of the duty of good faith and fair dealing." *Davila,* 805 S.W.2d at 908. It is not enough that a wrongful act is done intentionally. It must also be done with actual awareness that the act is highly likely to cause serious injury. In *Moriel* the Texas Supreme Court elucidated the circumstances under which punitive damages could be upheld in a gross negligence case.[4] Although, the Court expressed no opinion on the circumstances in which an insurer's intentional conduct will justify punitive damages, it did state that in general "an insurance carrier's refusal to pay a claim cannot justify punishment unless the insurer was actually aware that its action would probably result in extraordinary harm not ordinarily associated with breach of contract or bad faith denial of a claim—such as death, grievous physical injury, or financial ruin." *Moriel,* 879 S.W.2d at 23 n. 16 & 24.

■ Garza sets forth the following evidence she contends shows malice: As early as August 1990, Aetna knew both Garzas had no opportunity to set the fire. Yet Aetna's investigation focused solely on their possible involvement even to the extent that it failed to investigate whether the young man who had threatened to burn down the Garzas' store might have been involved. Aetna continued to demand examinations under oath even after conducting two extended recorded interviews and one informal interview. The jury could conclude that appellants were not engaged in a "sincere" pursuit of a right under the policy, but were trying to catch the Garzas in a misstatement that might invoke the fraudulent statement provision of the policy.[5] Finally, Aetna's continued refusal to provide a copy of the policy was without justification.

Of course, if Aetna's investigation showed that the young man who threatened to burn the Garzas' store had burned down their house, it would establish that the Garzas did not set the fire that destroyed their home (although it would not eliminate the possibility, however remote, that they had hired or persuaded him to set the fire). We are not prepared, however, to impose the requirement that an insurer must follow every lead in an arson investigation. An insurer must establish only whether or not its insureds committed arson; it has no duty to investigate all potential third party involvement.

Aetna had the right under the policy to take examinations under oath from its insureds. It also had the duty, however, to provide a copy of the policy to its insured upon request, a duty it failed to perform. Insisting that the insured perform her obligations under the policy while at the same time refusing to provide a copy of that policy is, as we have discussed, evidence of bad faith. It is not, however, such gross indifference or reckless disregard of its insureds' rights that goes well beyond the bad faith it establishes. Further, we find no evidence of "ill-will, bad, or evil motive" on the part of the defendants. Because the evidence is legally insufficient to support a finding of malice as defined in the court's charge, the award of exemplary damages was improper. Tex.R.App.P. 81(b)(1); *Southwestern Bell*

---

4. Although *Moriel* dealt with a suit based upon gross negligence, the opinion speaks about punitive damages in insurance bad faith actions generally. In so far as *Moriel* addresses these actions generally, we feel it is binding precedent upon this Court. This portion of *Moriel* is *judicial dictum*, not *obiter dictum* because the Supreme Court was expounding upon matters of importance to the jurisprudence of the state.

On *obiter* no court relies,
But *stare decisis* applies
When *dicta's* judicial
And thereby official,
Definite, wholesome, and wise.

Robert C. Ramsey, *Dicta: When Appellate Courts Say Too Much (and When It Just Seems That Way),* The Appellate Advocate (Tex. St. B. Appellate Prac. & Advoc. Sec. Rep.), September, 1994, at 5, 6.

5. One of Garza's witnesses, an arson expert, testified that he had attended a seminar presented by Aetna in which an Aetna employee advocated use of the fraudulent statement provision of the policy as a basis for denial. One of the techniques suggested was talking to an insured several times and then taking a sworn statement in hopes of catching the insured in a contradiction.

*Tel. Co. v. John Carlo Texas, Inc.,* 813 S.W.2d 613, 621 (Tex.App.—Houston [14th Dist.] 1991), *rev'd on other grounds,* 843 S.W.2d 470 (Tex.1992). Appellants' sixth point of error is sustained.

## B. Knowing Violations of the DTPA

■ Aetna argues next that there is no evidence that Aetna knowingly violated either the Insurance Code or the DTPA. The jury was instructed in substantial conformity with the definition of "knowingly" found in the DTPA and Aetna does not challenge that definition on appeal. TEX.BUS. & COM.CODE ANN. § 17.45(9) (Vernon 1987). Knowingly was defined in the charge as "actual awareness of the falsity, deception, or unfairness of the conduct in question. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness." The definition of "knowing" conduct for additional damages under the DTPA is much less onerous a burden for the plaintiff to prove than is the definition of "malicious" conduct for common law punitive damages.

Applying this definition of knowing, the jury could reasonably have found that Aetna knew as early as October 1990 that its liability on the claim was clear in view of the undisputed evidence that the Garzas had no opportunity to set the fire. Aetna knew it had an obligation to effectuate a prompt and fair settlement, but instead engaged in a pattern of delay characterized by Hendrick as a "cat and mouse game" with its insured. Further, the jury could have concluded that Aetna knew it was acting in a glaringly unfair manner when it refused for fourteen months to provide Garza with a copy of her policy while insisting on her compliance with obligations under that policy. Aetna was aware that Garza was forced to move in with relatives, had lost most of her possessions and was under medical care for both physical ailments and depression. This is sufficient evidence to support the jury's finding that Aetna knowingly engaged in unconscionable conduct. Aetna's seventh and eighth points of error are overruled.

## C. Double Recovery and Excessiveness

Appellants argue that the trial court erred in awarding Garza both exemplary damages and additional damages under the DTPA because it allowed an improper double recovery. They also contend that the amount of exemplary damages is excessive. We need not address these arguments because we have already held that the award of exemplary damages was improper.

## D. Trebling of Prejudgment Interest

■ Appellants' final argument is that the trial court erred in its calculation of additional damages under the DTPA by trebling the prejudgment interest. Prejudgment interest is not to be included in additional damages awarded pursuant to article 21.21 of the Insurance Code. *Vail v. Texas Farm Bureau Mut. Ins. Co.,* 754 S.W.2d 129, 137 (Tex.1988); *Southern Life & Health Ins. Co. v. Alfaro,* 875 S.W.2d 740, 748 (Tex. App.—San Antonio 1994, writ denied). Therefore, when a trial court calculates additional damages it is to be based upon the actual damages only, not actual damages plus prejudgment interest. The plaintiff is entitled, however, to be awarded prejudgment interest on the actual damages, but this interest is not to be trebled. Garza conceded at oral argument that prejudgment interest should not have been trebled in light of this Court's ruling in *Alfaro.* Aetna's eleventh point of error is sustained.

## VIII. Conclusion

We affirm the award of $150,000 in actual damages. We hold that Garza is entitled to recover additional damages under the DTPA, attorney's fees, ten percent prejudgment interest, court costs, and ten percent post judgment interest. We are unable to determine what figure the trial court used as actual damages for purposes of calculating the additional damages award under the DTPA. Also, it appears that the trial court trebled prejudgment interest in calculating such additional damages. Therefore, that portion of the judgment which awards additional damages under the DTPA is reversed and remanded to the trial court with instructions to calculate such damages without trebling the prejudgment interest. The award

of attorney's fees is dependent upon the amount of damages recovered by Garza. Therefore, the portion of the judgment awarding attorney's fees is reversed and remanded to the trial court to be calculated in accordance with the amount of damages ultimately awarded. The award of $1,000,000 in punitive damages is reversed and rendered. The judgment against Hendrick is reversed and rendered. In all other respects, the judgment is affirmed.

LOPEZ, Justice, concurring and dissenting.

I concur with the majority with the exception of that portion of the opinion regarding common law punitive damages. As to the majority's opinion on punitive damages, I respectfully dissent. An arsonist reduced the Garzas' home and its contents to a smoldering heap of trash. Aetna contracted to protect Garza from the ruin that follows such a tragedy. Instead, Aetna held Garza over the flame for two years until a court finally forced Aetna to play fair. What should we call the game that Aetna played when it refused to compensate Garza *for two years*? I call it malice. The jury called it malice. Considering the chronicle of Aetna's contemptible maltreatment of Garza that was presented to the jury, no reasonable jury could have found otherwise.

Aetna knew, shortly after the fire, that neither Mr. nor Mrs. Garza destroyed their own property. Aetna refused to pay. Aetna knew that Mrs. Garza had a life-long illness that formerly confined her to a wheelchair, that her house was specially equipped for her condition, and that she had lost nearly everything she owned in the house. Aetna refused to pay. A year and a half after the fire, and after numerous requests from Garza, Aetna finally allowed her to see a copy of her own insurance policy, but only when ordered by the court to do so. Aetna did not, however, pay. When Aetna finally decided to pay, it tendered $28,624.55 for "structural damage" to a fire-gutted home that was insured for $111,000. The majority claims that this amounts to no more than a scintilla of evidence of malice. Quite the contrary, the evidence of Aetna's conduct screams malice.

The majority's reliance on portions of *Moriel* is too selective. The majority points to the vague declaration that:

In general ... an insurance carrier's refusal to pay a claim cannot justify punishment unless the insurer was actually aware that its action would probably result in extraordinary harm not ordinarily associated with breach of contract or bad faith denial of a claim—such as death, grievous physical injury, or financial ruin.

*Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 24 (Tex.1994). A finding of malice is not, however, solely contingent upon the foreseeability of "death, grievous physical injury, or financial ruin." As noted in *Moriel,* "some forms of insurance, such as disability insurance, may be such that insurers frequently can expect that bad faith denial of coverage will result in such an extraordinary degree of hardship and oppression that punishment would be warranted." *Id.* It would be incredible to maintain that, in unjustifiably withholding payment from Garza for so long after her home and possessions were incinerated, Aetna could not reasonably expect a result of extraordinary hardship and oppression.

Aetna surely had Garza under its thumb. By insisting that Garza perform obligations under the policy while refusing to even provide a copy of the policy is, as the majority notes, evidence of bad faith. I disagree that it is no evidence of malice. The game itself was contemptible, but the manner in which it was played was malicious. Considering the duration of Aetna's belligerence, its unreasonableness, and the dire consequences for Garza, Aetna's conduct certainly went "well beyond that which justifies an affirmative finding of a breach of the duty of good faith and fair dealing." *Automobile Ins. Co. v. Davila,* 805 S.W.2d 897, 908 (Tex.App.—Corpus Christi 1991, writ denied), *overruled on other grounds by Hines v. Hash,* 843 S.W.2d 464 (Tex.1992). Under either of the two contested definitions of malice, the record before this court reeks of malice. The jury detected it and so do I. I would, therefore, affirm the trial court's award of punitive damages.